UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

REGINA HARVEY,

*Plaintiff,*

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

*Defendant.*

Civil Action No.: 1:24-cv-11741-DJC

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT**

## I. INTRODUCTION

This Court's decision on Defendant Massachusetts Institute of Technology's ("MIT") Motion to Dismiss narrowed Plaintiff Regina Harvey's suit to two discrete issues: whether she experienced a hostile work environment based on her race in violation of Mass. Gen. Laws chapter 151B (Count I), and whether she experienced unlawful retaliation for taking leave under the Family and Medical Leave Act (FMLA) (Count II). [ECF No. 1-1.] Discovery has now shown that Plaintiff has no hope of demonstrating the existence of facts necessary to prevail on either claim.

Plaintiff's race-based hostile work environment claim is premised on the dual fallacies that anything her supervisor Maureen Johnston did or said to hold her accountable or otherwise critique her contributed to an actionable hostile working environment, and that Ms. Johnston must have been motivated by race because she is White and Ms. Harvey is Black. On this unsound foundation, Plaintiff constructs her claim out of any managerial decision she can recall that did not go her way, and any criticism with which she disagreed, hoping to give the impression that with so much to recount, there must be enough to get to a jury. But the person she accuses is the same woman who first hired and then promoted her, along with another Black employee, to the position of Associate Director, rated her highly, and even gave her personal gifts, and who Plaintiff claims treated her Black counterpart better. While the incidents Plaintiff enumerates arguably may indicate that her relationship with Ms. Johnston grew tense over time, particularly in the fall of 2022, they are not enough to stave off summary judgment. On the record as a whole, no reasonable jury could conclude that what Plaintiff describes amounts to a race-based hostile work environment.

Plaintiff's FMLA retaliation claim also fails, for the simple reason that there is no record evidence of any retaliatory conduct by MIT. With discovery completed, the record confirms that MIT took no adverse employment action against Ms. Harvey after learning of her leave, but after

over six months on leave, during which she was paid 100% of her regular salary—well beyond the requirements of federal law—she remained medically unable to return to work, resulting in her termination. As such, the undisputed facts preclude this claim as well.

## II. FACTUAL SUMMARY

### A. Plaintiff's Employment with MIT

MIT is an internationally renowned private research university in Cambridge, Massachusetts. SOF ¶ 1.[1] MIT Health, previously known as MIT Medical, is an accredited full ambulatory care center on the MIT campus and in Lexington, MA, serving members of the MIT community who live and work in these areas. SOF ¶¶ 2-3.

Ms. Harvey, who identifies as Black, joined MIT Health in October 2020 as a Nurse Practice Manager for Primary Care, on campus and in Lexington. SOF ¶¶ 5-6. She was hired by and reported to Director of Clinical Operations and Chief of Nursing Maureen Johnston, who is from Northern Ireland and identifies as White. SOF ¶¶ 7-9. In her July 2021 performance review, Ms. Johnston rated Ms. Harvey a 5 out of 5. SOF ¶ 10. In the fall of 2021, Ms. Johnston promoted Ms. Harvey to Associate Director of Nursing, Clinical Operations, overseeing Primary Care, Family Medicine, Population Health, and referrals. SOF ¶¶ 11-12. The promotion led to pay increases totaling 16%. SOF ¶¶ 15-16. At the same time Ms. Johnston also elevated another Black nurse, Ketline Edouard, to the Associate Director level, giving her responsibility over specialty clinics and Urgent Care. SOF ¶¶ 13-14. In her June 2022 performance review, Ms. Johnston rated Ms. Harvey a 4 out of 5; she rated Ms. Edouard a 5 out of 5. SOF ¶¶ 17-18.

As Associate Director, Ms. Harvey had direct reports including the Nurse Practice Supervisors (NPS) for her units, who in turn supervised other nurses. SOF ¶ 27. In 2022, Ms.

[1] References to "SOF ¶ __" are to MIT's Statement of Material Facts Not in Dispute, accompanying this Memorandum. MIT treats the referenced facts as undisputed *solely* for purposes of its present Motion for Summary Judgment.

Johnston became aware of concerns within Ms. Harvey's areas of responsibility, including that other nurses complained about one NPS "all the time," that nurses expressed concern about communication, inclusion in decision-making, and other matters, and that seven nurses within Primary Care left their full-time positions. SOF ¶¶ 28-30. Ms. Johnston expected Ms. Harvey to handle concerns about the NPS, and in November questioned her handling of a patient complaint and a coverage issue in Lexington, both in Ms. Harvey's areas of responsibility. SOF ¶¶ 28, 31-32. Ms. Harvey considered that Ms. Johnston or others should have been handling these issues. Id.

Ms. Johnston and MIT Health Director of Human Resources Thanh Giddarie met with Ms. Harvey on November 22, 2022 to discuss various matters relating to Ms. Harvey's performance. SOF ¶ 33. Ms. Giddarie then drafted an email recapping that discussion and requiring Ms. Harvey to prepare a corrective action plan, which Ms. Giddarie sent to Ms. Johnston for review on December 1. SOF ¶ 34. On December 4, Ms. Johnston replied to Ms. Giddarie with some changes, including adding a requirement that Ms. Harvey prepare a staffing proposal for her department. SOF ¶ 35. Ms. Johnston then finalized the email and sent it to Ms. Harvey on the morning of Tuesday, December 6 (the "Recap Email"). SOF ¶ 39.

**B. Plaintiff's Extended Medical Leave and Failure to Return to Work**

In the fall of 2022, Ms. Harvey experienced various health and personal challenges, including medical concerns and grief over recent losses. SOF ¶ 46. After initially being approved for intermittent FMLA leave by MIT's third party leave administrator, on December 5, 2022 she indicated to them her intention to seek a continuous FMLA leave. SOF ¶¶ 47-48. On December 5, Ms. Harvey informed Ms. Johnston that she planned to take a leave starting December 12, which Ms. Johnston understood would last two weeks. SOF ¶¶ 36-38. After receiving the Recap Email, Ms. Harvey notified Ms. Johnston that she was not feeling well and stayed out of work for two days, then requested to work from home on the following two days. SOF ¶¶ 42-43. In response to

these messages, Ms. Johnston expressed concern for Ms. Harvey's well-being and approved her requests to work from home. SOF ¶¶ 42-44.

After the start of her FMLA leave on December 12, 2022, Ms. Harvey never sought to return to work. SOF ¶¶ 49-52, 58. All her requests to extend her leave were granted, and she remained out of work for over 26 weeks. SOF ¶¶ 50-51.[2] In the meantime, Ms. Johnston initially covered her duties, and Ms. Edouard later did so on an interim basis. SOF ¶ 60.[3] Ms. Harvey did not return or request an accommodation at the end of her approved leave in June; instead, in May she applied for long term disability (LTD) benefits (which were granted), indicating a continued inability to work. SOF ¶ 55-56. In light of this, MIT applied its neutral policy relating to employees unavailable for work and terminated her employment effective June 20, 2023. SOF ¶¶ 54-59.

### C. Alleged Harassing Conduct and Comments

Ms. Harvey considered that her relationship with Ms. Johnston was initially positive. SOF ¶ 21. The record reflects that Ms. Johnston gave her gifts for her birthday and Christmas, and sent her warm messages thanking her for her work or otherwise being friendly. SOF ¶¶ 21-22. However, Ms. Harvey believes that at some point after her promotion, particularly after the summer of 2022, Ms. Johnston's attitude toward her changed. SOF ¶¶ 23-25.[4] Specifically, Ms. Harvey believes the following created a racially hostile work environment:

- In September 2022, Ms. Johnston removed Ms. Harvey from two committees so she could focus on Primary Care. She was replaced on the ASN (population health) committee, by a Black nurse hired as a population health manager; she was replaced on the committee for the STI Clinic, which was a student service, by a White nurse whose role was shifting to becoming solely focused on student health. SOF ¶¶ 62-67.

[2] Throughout this time, she received 100% of her pay pursuant to the applicable MIT policy. SOF ¶ 53.
[3] While Ms. Harvey asserted at her deposition that she felt MIT Health made changes that prevented her from returning to work, based on seeing emails about role changes during her absence, she confirmed that nothing changed for her and she "do[es]n't know what the outcome would have been" if she had sought to return. SOF ¶ 61; see id. ¶ 60.
[4] Ms. Harvey's testimony regarding when this change purportedly occurred varied. See SOF ¶ 24 (identifying different dates ranging from fall 2021 through fall 2022). She also considered that the MIT Health "leadership team" "started treat[ing] her differently" the week of November 21 or 22, 2022. SOF ¶ 26.

- Ms. Johnston indicated that Ms. Harvey could not attend two conferences, including one relating to the ASN committee work. She was later told she could attend, and would need to submit a request consistent with policy, but did not attempt to do so. SOF ¶¶ 68-73.
- Ms. Johnston declined Ms. Harvey's request for a raise for a Black employee, stating she considered the employee's pay appropriate. SOF ¶¶ 74-77. Ms. Harvey may have also asked to raise the pay for medical assistants, some of whom were Black, which was not approved. SOF ¶ 78. And in fall 2022, Ms. Johnston also declined to approve a job grade change for the NPSs under Ms. Harvey, none of whom were Black, absent Ms. Harvey submitting justification for the grade change request, which she did not do. SOF ¶¶ 90-92.
- In Fall 2022, after Ms. Harvey gave short notice of her need to leave work early, Ms. Johnston asked Ms. Harvey to give her notice in the future, noting that she required this of her other direct reports, of whom two were White and one other besides Ms. Harvey was Black, and noting that she herself did the same for her boss. SOF ¶¶ 79-81.
- Ms. Johnston once asked Ms. Harvey to select employees for out-of-state spirometry training, but later indicated they would not go. SOF ¶¶ 82-84.
- Ms. Johnston assumed that when subordinates in Ms. Harvey's department complained about "leadership" they meant Ms. Harvey, although they did not name her specifically and, when questioned by Ms. Harvey, denied that they meant her. SOF ¶ 85.
- Ms. Johnston was slow to address personnel shortages in Ms. Harvey's department three times in 2022, unlike for Ms. Edouard's department. SOF ¶¶ 86-87.
- Ms. Johnston did not accept a suggestion Ms. Harvey made about a workflow, though when it was raised again months later by a White employee it was accepted. SOF ¶ 88.
- Ms. Johnston sometimes sided with complaining pediatricians. SOF ¶ 89.
- When the November Patient Complaint was raised in a subsequent meeting with Executive Director Brian Schuetz, Ms. Johnston and others (the "November Senior Leadership Meeting"), one person's comments suggested Ms. Harvey had not followed the required workflow. After another person defended Ms. Harvey, the first apologized, but Mr. Schuetz did not let Ms. Harvey speak. SOF ¶ 93.

Ms. Harvey testified that she considered she was removed from the ASN committee "because of who" Ms. Harvey is. SOF ¶ 109. Ms. Harvey also felt Ms. Johnston was "singling her out" "as a [B]lack woman" and one "who spoke up." SOF ¶¶ 110-112. Ms. Harvey has also alleged the following as support for her claim that she was subjected to a hostile work environment:

- In 2020, Ms. Johnston described a Black doctor as "rough and tough," and may have called her "argumentative" or "aggressive"; she also said the doctor did not "get along with anybody," although Ms. Harvey thought she got along with the doctor. SOF ¶¶ 96-97.
- Ms. Johnston twice described another Black employee as "rough around the feathers" or "rough around the edges" and "edgy," and when the employee sought a promotion six

months after first becoming a supervisor and despite not having a college degree, Ms. Johnston described her as not ready for the promotion and "uneducated," not knowing that she had obtained some college credits. SOF ¶¶ 98-100.

- When one employee, who was Black, applied for a lead role Ms. Johnston declined to promote her, saying she was "rough and loud." Of the three employees selected instead, two were Black, and the third was Hispanic. SOF ¶¶ 101-102.
- Once, in 2021 or early 2022, while Ms. Johnston and Ms. Harvey were discussing their families and recent events, Ms. Harvey showed Ms. Johnston a picture of her grandson and Ms. Johnston asked if he was White, which made Ms. Harvey uncomfortable. SOF ¶ 103.
- On August 9, 2022, after attending a meeting at which Ms. Harvey and another Black employee presented, Ms. Johnston told Ms. Harvey that she had been "well-spoken" or "spoke very well" at the meeting, and in an email, Ms. Johnston wrote that she "greatly enjoyed" the session and that Ms. Harvey "spoke very well and provided a great introduction and summary." SOF ¶¶ 104-106.[5]
- In Fall 2022, Ms. Johnston told Ms. Harvey that nurses were leaving due to her "leadership" and said her "leadership style" was "autocratic"; Ms. Harvey disagreed. SOF ¶ 107.
- In November 2022, following a meeting between Ms. Johnston, Ms. Giddarie and Ms. Harvey to discuss her NPS job grade change request, Ms. Johnston told Ms. Harvey that she had been "combative" and "aggressive." SOF ¶ 108. Ms. Harvey disagreed, and considered this description to be connected to her race because it was directed to her and because of the "tone" and "manner" in which it was said. SOF ¶ 113.

Ms. Harvey testified that she was never physically threatened or publicly humiliated, and the complained-of incidents did not impact her work performance. SOF ¶¶ 114-116.[6]

## III. STANDARD OF REVIEW

Summary judgment is warranted where there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating this motion, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Prescott v. Higgins*, 538 F.3d 32, 39 (1st Cir. 2008). Rather, "[e]vidence of a genuine dispute of material fact must be significantly probative and more than merely colorable." *Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 503 (1st Cir. 2022)

[5] While MIT denies that Ms. Johnston said Ms. Harvey was "well-spoken," and Ms. Harvey's own testimony on this is equivocal (SOF ¶ 108), for purposes of this motion only, MIT takes the facts in the light most favorable to Plaintiff.
[6] Ms. Harvey also testified that other than the conduct she attributed to Ms. Johnston, and the November Senior Leadership Meeting, no other MIT employee mistreated her based on her race. SOF ¶¶ 94-95.

(internal quotations and citations omitted). The moving party prevails if it "produce[s] evidence that negates an essential element of the non-moving party's claim," or uses "evidentiary materials already on file" to "demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial" (*Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)), and the non-moving party "fail[s] to produce any evidentiary proof concerning one of the essential elements of [her] claim" (*Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013)).

## IV. ARGUMENT

### A. The Record Does Not Support Plaintiff's Claim of a Race-Based Hostile Work Environment (Count I)

A cause of action for discrimination in violation of Chapter 151B based on a racially hostile work environment requires a plaintiff to show she was subjected to "offensive race-based conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment." *Bennefield v. Kohl's Dep't Stores, Inc.*, 2012 WL 1560407, at *3 (Mass. Super. Feb. 17, 2012) (quoting *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000)).[7] Under Chapter 151B, "[a] hostile work environment is one that is pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001) (internal quotations omitted). To succeed on such a claim, the plaintiff must show that the environment was "sufficiently hostile or abusive in light of all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Thompson v. Coca-Cola Co.*, 522

[7] "[I]n determining what circumstances will give rise to a hostile work environment claim under G.L. c. 151B, the court may look to Federal cases addressing [such] claims under" the analogous Title VII. *Id.*

F.3d 168, 180 (1st Cir. 2008) (interpreting a claim under Chapter 151B) (internal quotations omitted). While Plaintiff, who is Black, is a member of a protected class based on race, the undisputed material facts demonstrate that there is no triable issue of fact showing that she was subjected to severe or pervasive harassment, or that such claimed harassment was based on race.

**1. No Reasonable Jury Could Find that the Complained-Of Conduct Constituted Harassment that Was So Severe or Pervasive that It Altered the Conditions of Plaintiff's Employment.**

As an initial matter, to prevail on her claim, Ms. Harvey must show that "the work environment was both objectively and subjectively offensive." *Conto v. Concord Hosp., Inc.,* 265 F.3d 79, 82 (1st Cir. 2001) (internal quotations omitted). It is not enough for her to *perceive* the environment as offensive; she must demonstrate that the workplace is one that "a reasonable person would find . . . hostile or abusive" as well. *Id.* Further, an actionable hostile work environment is one where the harassment is "so severe or pervasive that it alter[s] the conditions of [the plaintiff's] employment." *Id.* As this Court has noted, "[h]arassment is only 'severe' if the act is physically threatening or humiliating, rather than a merely offensive utterance, and 'pervasive' means more than occasional." *Faltas v. Mass. Dept. of Children and Families*, 2021 WL 1195630 at *6 (D. Mass. Mar. 30, 2021) (Casper, J.) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

Evidence of "regular business practices and policies," such as switching personnel, and "relatively standard workplace interactions and criticisms," such as a supervisor requiring daily status reports, is insufficient for a hostile work environment claim to survive summary judgment. *Tuvell v. Int'l Business Machines, Inc.*, 2015 WL 4092614 at * 12 (D. Mass. Jul. 7, 2015) (Casper, J.) (citing *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)). The hostile work environment standard "demands that [the court] distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Franchina v. City of Providence*, 881 F.3d 32, 46 (1st Cir. 2018) (internal quotation omitted). Moreover, even if a supervisor's

interactions with her subordinate "may be described as brusque and even uncivil," where the incidents "are episodic, but not frequent, in nature; upsetting, but not severe; mildly humiliating, but not physically threatening" and where the "acts do not appear to have affected [the employee's] overall work performance," the actions do not rise to the level of a hostile work environment. *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 44–45 (1st Cir. 2011) (citing *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 46-47 (1st Cir. 2003)).

The record here is devoid of admissible evidence indicating that Ms. Johnston or anyone else at MIT engaged in severe or pervasive harassment of Plaintiff that was both subjectively and objectively offensive. Not only did Ms. Harvey confirm that Ms. Johnston never physically threatened or publicly humiliated her, she also testified that none of the instances in which she felt she was mistreated based on her race had an impact on her work performance. SOF ¶¶ 116-118. These undisputed facts doom her claim. *See Colón-Fontánez,* 660 F.3d at 45 (pointing out that the plaintiff contended that the conduct did not affect her overall work performance); *Faltas*, 2021 WL 1195630 at *5-7 (rejecting hostile work environment claim, noting that there was no showing that the plaintiff's work was affected, as he "maintain[ed] that his work was adequate").

Consistent with this, Ms. Harvey's allegations do not amount to severe or pervasive harassment. Turning first to the purported incidents of harassing conduct, most of the events Plaintiff complains of were ordinary supervisory actions, such as deciding whether Ms. Harvey should spend her time on a committee versus on other duties, requiring her to follow protocols regarding notification of absences, conference attendance and job grade changes, determining whether another subordinate's raise or promotion was warranted, deciding whether off-site training would be offered, and requiring Ms. Harvey to address complaints involving her areas of responsibility. SOF ¶¶ 62-92. Labeling these as "micromanagement" does not change their

character as everyday workplace conduct. The other actions purportedly taken by Ms. Johnston (that she wrongly assumed complaints about "leadership" referred to Ms. Harvey, was slow to address personnel gaps, failed to take up a suggestion, and sometimes sided with pediatricians (SOF ¶¶ 85-89)), as well as the sole alleged incident involving others at MIT Health (that at a meeting it was wrongly assumed that Ms. Harvey had made a mistake in workflow and she was not allowed to speak (SOF ¶¶ 93-95)), might be said to reflect poor managerial decisions, but no reasonable juror could conclude that any of this purported conduct was "abusive" or "harassing."

The same goes for the alleged harassing comments. Notably, there is no allegation that Ms. Johnston or anyone else at MIT ever uttered a racial slur, used profanity toward Plaintiff, mocked her, or did anything remotely similar. Indeed, only one alleged comment has any direct connection to race: Ms. Johnston asking Ms. Harvey if her grandson was White upon seeing a photo of him. While the question may have made Ms. Harvey "uncomfortable" (SOF ¶ 103), no reasonable jury could consider this to be so "severe" as to create a racially hostile work environment claim. *See Gillenwater v. The Home Depot Inc.*, Case 2022 WL 17363508 (D. Mass. Dec. 12, 2022) (Casper, J.) (rejecting a Chapter 151B hostile work environment claim, where the plaintiff relied on vague allegations of "insults," "slurs," "ridicule," and "mockery," one alleged incident of "name calling," and the posing of a question that the plaintiff believed to have negative racial undertones).

The remaining comments purportedly evidencing harassment, almost all of which were allegedly used just once, are comments involving the words "rough," "edgy," "loud," "argumentative," or "uneducated," which were not directed at Plaintiff (SOF ¶¶ 96-102), and the terms "well-spoken," "combative," "aggressive," and reference to "leadership," the only ones purportedly made to Ms. Harvey about her (SOF ¶¶ 104-108). These amount to a handful of incidents over two years, none of which was severe, and most of which involved someone other

than Ms. Harvey. This, too, is insufficient for a reasonable person to find that any claimed racial hostility was either "severe" or "pervasive." In short, whether taken together or separately, neither the claimed conduct nor the alleged comments created an environment that a reasonable jury could find was objectively hostile or abusive so as to alter the conditions of Plaintiff's employment.

The *Colón-Fontánez* and *Lee-Crespo* cases are instructive here. In *Colón-Fontánez*, the plaintiff alleged repeated unprofessional conduct by her manager, including that she refused to meet with the plaintiff; once threw the plaintiff out of her office, yelled at her publicly, then allowed others to enter without yelling at them; prevented the plaintiff's assistant from working with her; designated someone to follow her; and did not allow her to participate in a workshop. 660 F.3d at 44. Yet the Court found this conduct was "not sufficiently severe or pervasive" but indicated merely "an uncomfortable and tense working relationship between" the plaintiff and her supervisor. *Id.* at 44-45. In *Lee-Crespo*, the plaintiff alleged, *inter alia*, that her supervisor made an untrue accusation about her to coworkers; and used a "loud" and "scolding" voice to "accuse[] her of having a negative attitude" and threatened a reassignment. 354 F.3d at 39. In addition, at a meeting with the plaintiff's superiors, they accused her of being a poor employee and "never let [her] talk." *Id.* at 40. None of this amounted to a hostile work environment, either. *Id.*

The conduct and comments that Plaintiff complains of here were less significant than what was alleged in these two cases: Ms. Harvey has not alleged (nor could she) that Ms. Johnston or anyone else yelled at her, had someone follow her around, prevented subordinates from working with her, refused to meet with her, or threatened to reassign her. The conduct Ms. Harvey describes involves incidents that are no more substantial than what the *Colón-Fontánez* Court deemed "upsetting, but not severe," no more frequent than what that Court found to be merely "episodic," and ultimately no more significant than what both the *Colón-Fontánez* and *Lee-Crespo* Courts

deemed insufficient to support a hostile work environment claim.

**2. No Reasonable Jury Could Find that the Complained-Of Conduct Was Harassment Based on Race.**

Even if the events at issue in this case could be construed as severe or pervasive harassment—which they cannot—to survive summary judgment Plaintiff must also proffer admissible evidence showing that her work environment was pervaded by *race-based* animus that motivated the complained-of conduct. *Matthews v. Raytheon Co.*, 2009 WL 5910243, at *3 (Mass. Super. Ct. Dec. 23, 2009). Ms. Harvey cannot do so.

A plaintiff's "membership in a protected class, without more, is insufficient" to show discrimination in violation of Chapter 151B. *Id.* (citing *Weber v. Cmty. Teamwork, Inc.,* 434 Mass. 761, 778 (2001)). At summary judgment, the plaintiff cannot rely on facially neutral statements, *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 21 (1st Cir. 2025), or on her personal belief that the complained-of conduct was based on protected status. *See, e.g., Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 318 (1st Cir. 2016) (affirming summary judgment to employer despite allegations that, *inter alia,* plaintiff was subjected to intimidation, where there was no evidence that this was because of his race, only his own belief); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) ("As between [an] 'obvious alternative explanation'" and an inference of "purposeful, invidious discrimination . . . discrimination is not a plausible conclusion").

As a result, courts decline to attribute bias to objectively neutral statements and conduct. For example, the First Circuit recently held that comments about a female plaintiff, even though made to her and not to male counterparts, were insufficient to support a gender-based hostile work environment claim where they were neutral and there was evidence that they could have been made for unrelated reasons. *O'Horo*, 131 F.4th at 21. Where "[a]ll [the court has] to tie these comments to" the plaintiff's protected status is her "conjecture," such "subjective perception,

standing alone, is not enough" to survive summary judgment. *Id.* Indeed, even remarks "tending to suggest animus based on" protected status, when they are "isolated or ambiguous," are "insufficient, standing alone, to prove an employer's discriminatory intent.'" *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 636 (1st Cir. 1996), as amended (Jan. 22, 1997) (citing cases) (finding that alleged manager comment, "why do I need a 71 year old when I can have a 51 year old?" did not support inference of age discrimination in light of all the circumstances).[8]

Plaintiff here cannot meet her burden to present admissible evidence of race-based harassment that is more than merely "colorable." *Dusel*, 52 F.4th at 503. As to the complained-of conduct, such as that Ms. Johnston removed Plaintiff from certain committees, did not approve raises for some subordinates, and did not agree to increase the NPS job grade absent a formal written justification, Ms. Harvey contends these were based on race because she and some of these employees are Black while Ms. Johnston and some of her other direct reports are not, and because Ms. Harvey personally believes that these actions were taken because she is a Black woman who "spoke out." SOF ¶¶ 109-112. Such "conclusory allegations" and "unsupported speculation" are insufficient for her claim to withstand summary judgment*.* *Prescott*, 538 F.3d at 39.

Moreover, the record actively precludes any inference of race animus: Ms. Johnston promoted both Ms. Harvey and Ms. Edouard knowing both were Black; the individual who replaced Ms. Harvey on the ASN committee was Black; the person whose departmental vacancies Ms. Johnston purportedly addressed more promptly—and thus treated better—was Black; and the other employees who Ms. Johnston noted had to report their absences to her—and thus were treated no better than Ms. Harvey—were White. SOF ¶¶ 11, 13, 63, 87, 81.[9] In fact, there are "obvious

[8] *See also Thompson*, 522 F.3d at 180 (finding that manager's alleged comment, "I'll deal with you, you f[***]ing Jamaican," was not enough to demonstrate a hostile work environment in light of all the circumstances).
[9] Similarly, two of the three lead medical assistants selected instead of the referenced Black employee were themselves Black. SOF ¶ 102.

alternative explanations" for the complained of events. *Iqbal*, 556 U.S. at 682. For example, Ms. Harvey was replaced on the ASN (population health) committee by the (Black) nurse hired to be the population health manager, and one of the conferences Ms. Harvey claims she could not attend was related to the same committee; the patient and coverage complaints were within her areas of responsibility, even if directly handled by subordinates; and Ms. Harvey was the Associate Director responsible for the department where employees were leaving and complained about a supervisor and about "leadership." SOF ¶¶ 28, 31-32, 63, 68, 85, 107. In these circumstances, "purposeful, invidious discrimination . . . is not a plausible conclusion." *Iqbal*, 556 U.S. at 682. *See, e.g., Green-LaRoche v. Boston Univ. Neurology Assocs, Inc.*, 36 Mass. L. Rptr. 34, 2019 WL 5100407 at *6 (Mass. Super. Ct. Sept. 18, 2019) (noting that evidence that the female plaintiff's female colleague received the bonus that the plaintiff did not, that a male colleague got the same unfavorable on-call schedule as the plaintiff, and that the selection of an employee for a role was based on their position and not their identity, all undermined gender discrimination claim).

Similarly, as to the purported comments at issue in this case, Ms. Harvey can only offer her subjective beliefs about a connection to racial animus. For example, Ms. Harvey considered Ms. Johnston calling her "aggressive" and "combative" to be indicative of discrimination because this was directed to her, and because of the "tone" and "manner" in which this was said. SOF ¶ 113. But the mere fact that Ms. Harvey is Black and Ms. Johnston is White is not sufficient to show racial animus. *Matthews*, 2009 WL 5910243, at *3. And even if Ms. Johnston's "tone" and "manner" may have conveyed *hostility*, the comment itself was, at most, ambiguous, and thus not "significantly probative" of any such hostility being *based on race*. *Dusel*, 52 F.4th at 503; *see Speen*, 102 F.3d at 636. Similarly, while Ms. Harvey may disagree with being held accountable for certain concerns relating to her department, with Ms. Johnston's assessment of her "leadership,"

or whether she had been "aggressive" in the meeting with Ms. Giddarie (SOF ¶¶ 31-32, 107-108), this is insufficient to demonstrate a connection to discriminatory intent. *Cf. Compton v. GTE Gov't Sys., Corp.*, 1995 WL 791938, at *6 (D. Mass. Dec. 7, 1995) ("disagree[ment] with [the employer's] assessment of [the plaintiff's] relative performance . . . is not sufficient to create a triable issue" that the employer's stated non-discriminatory reason for its conduct was pretextual). Further, simply labeling this or any other comment a "racial trope," as Plaintiff's Complaint does, is not enough to require the claim to go to a jury when the record is viewed as a whole.

The *Matthews* court considered some of the same types of allegations as Plaintiff has made here and found them insufficient to withstand summary judgment. *Matthews*, 2009 WL 5910243. For example, the plaintiff in *Matthews* alleged that a human resources officer "blamed [plaintiff's] management style" for certain employee problems and opposed her recommendation to promote a member of her team. *Id.* at *1-2. In addition, the plaintiff's supervisor criticized her conflict management skills and other aspects of her performance, and after the plaintiff accused the supervisor of treating her differently because she was a Black woman, the supervisor made reference to the plaintiff's tendency to publicly disagree with her. *Id.* Although the plaintiff alleged that the employer showed racial animus because it "constantly undermines and tests its employees of color to make sure they are conforming," and claimed that she "does not play the accepted role for [B]lack employees at [the employer] in that she speaks out," the Court determined that these generalized characterizations were not supported. *Id.* at *3-4. The *Matthews* Court found that the evidence "[a]t best . . . suggests that [the supervisor and HR professional] treated [the plaintiff] unfairly," but there was no "reason to infer that" racial animus was their "motivation for doing so." *Id.* at *4. The Court observed that the employer was "entitled to an inference that [the supervisor's] conduct was not discriminatory, because it was she who hired [the plaintiff], knowing she was a

[B]lack woman." *Id.* at * 4 (citing *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 847 (1st Cir. 1993)).

So too, here, MIT is entitled to an inference that Ms. Johnston's conduct was not discriminatory, given that she hired and promoted Plaintiff and gave her positive reviews in both 2021 and 2022. SOF ¶¶ 10-11, 17.[10] Ms. Harvey herself noted that she and Ms. Johnston initially had a "positive relationship." SOF ¶ 21. Consistent with this, the record contains multiple examples of their warm interactions throughout Ms. Harvey's employment. SOF ¶¶ 21-22. What is *not* in the record is any evidence from which it would be reasonable for a jury to infer that Ms. Johnston (or anyone else at MIT Health) bore any *race-based* animus toward Plaintiff. And since there is no *evidence* of racial animus, Plaintiff cannot rely on the mere fact of her race, or labels, characterizations or personal beliefs, such as that she was "micromanaged" or was treated differently because she was a Black woman who "spoke out," to meet her burden of proof.

In sum, on the record facts here, no reasonable jury could find that Plaintiff experienced actionable race-based harassment.

**B. The Record Evidence Does Not Support FMLA Retaliation (Count II).**

In Count II, alleging retaliation in violation of the FMLA, Plaintiff bears the ultimate burden of proving that MIT took an adverse employment action against her in retaliation for her exercising statutory rights. *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir. 2005). The adverse action must be one that "a reasonable employee would [find] materially adverse," meaning it would deter them from taking leave. *Gregg v. Ne. Univ.*, 743 F. Supp. 3d 257, 278 (D. Mass. 2024) (citations omitted). This "typically involve[s] discrete changes in the terms of employment" such as termination, demotion, reassignment with significantly different responsibilities, or decisions causing a significant change in benefits. *Id.* at 277. Plaintiff

[10] Indeed, Ms. Johnston also promoted Ms. Edouard, Ms. Harvey's counterpart, at the same time, and gave her the highest available rating—higher even than Ms. Harvey—in 2022. SOF ¶¶ 13, 18.

also must show the employer bore retaliatory animus linked to the adverse action, which may be established either through direct evidence, or if none, then through circumstantial evidence following the familiar *McDonnell Douglas* burden-shifting framework. *Colburn*, 429 F. 3d at 335. Under this framework, the plaintiff must first establish a *prima facie* case of FMLA retaliation by showing that (i) she engaged in FMLA protected activity; (ii) she was subjected to an adverse employment action; and (iii) there is a causal connection between the two. *Gregg*, 743 F. Supp. 3d at 278; *see also Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 69 (1st Cir. 2015). If the plaintiff is successful, the employer must articulate a legitimate, non-retaliatory reason for the adverse action. Ultimately, the plaintiff bears the burden of demonstrating that the employer's stated reason "was in fact a pretext for retaliat[ion]" for the plaintiff having taken FMLA leave. *Colburn*, 429 F. 3d at 336. Plaintiff cannot meet her burden here.

**1. Plaintiff Was Not Terminated in Retaliation for Taking FMLA Leave.**

MIT does not dispute that Ms. Harvey engaged in protected activity by taking FMLA leave and that her employment was eventually terminated. Any FMLA retaliation claim premised on the termination nevertheless fails because Plaintiff can proffer no admissible evidence of retaliatory intent, where the termination occurred *more than six months after* she first went on leave and where she remained unable to return to work.

Here, there is no direct evidence of retaliation, and Plaintiff cannot meet her initial burden under the *McDonnell Douglas* framework because there is no evidence of a causal connection between her FMLA leave and the termination. The mere fact that the adverse action (termination) occurred after her protected conduct (taking leave) is not enough. *Gregg*, 743 F. Supp. 3d at 279. Even if Plaintiff could identify a causal connection, which she cannot, MIT easily meets its burden at the second step of demonstrating a legitimate non-retaliatory reason for the termination: Ms. Harvey confirmed that she was unable to return to work more than three months after exhausting

her FMLA leave entitlement,[11] did not request an accommodation, and instead filed for LTD benefits. SOF ¶¶ 54-55. Thereafter, MIT applied its neutral policy by terminating her employment. SOF ¶ 59.[12] Finally, at the third step, Plaintiff can point to no record evidence that could lead a reasonable jury to conclude that this reason was actually pretext for retaliation. Accordingly, the fact of Plaintiff's eventual termination cannot serve as a basis for her FMLA retaliation claim.

**2. Plaintiff Did Not Experience Any Other Adverse Employment Action After Exercising FMLA Rights.**

No factual basis exists for a reasonable jury to find that MIT took any other action against Ms. Harvey that could be deemed an "adverse employment action." The record evidence belies the only factual allegations on which Plaintiff's retaliation claim rests: (a) that Ms. Johnston reacted "negatively and harshly" to Ms. Harvey's leave (ECF No. 1-1 (Complaint) ¶ 32), (b) that she sent Ms. Harvey an email about her performance with "a long list of tasks that she demanded that Ms. Harvey complete" (*id.*), and (c) that this or some other action by MIT "prevented" Ms. Harvey from returning to work after her leave (*id.* ¶ 33.)

First, there is no record evidence of any "harsh" or "negative" reaction by Ms. Johnston to Plaintiff's notification that she would be taking FMLA leave starting the following week, much less any amounting to a "discrete change[] in the terms of employment." *Gregg*, 743 F. Supp. 3d at 277. To the contrary, Ms. Johnston was solicitous of Ms. Harvey, wished her well after receiving last minute notices of her absences, and let her work remotely, even though this meant she was not present at MIT Health for most of the week before the start of her approved leave. SOF ¶¶ 42-44.

[11] Indeed, she remained unable to work at the time of her deposition. SOF ¶ 57.

[12] By the same token, her continued inability to return to work and her application for LTD benefits more than three months after the end of her FMLA leave and before her termination (SOF ¶ 55) were significant intervening events that preclude any temporal proximity argument. *See, e.g., Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 95 (3d Cir. 2020) (finding "a discrete, readily determinable intervening event of sufficient severity to break any causal nexus" precluded reliance on temporal proximity of "two to three months" in FMLA retaliation claim).

Second, Ms. Harvey confirmed that the purportedly retaliatory email referenced in the Complaint was the Recap Email, and that the alleged "long list" of tasks was the instruction to prepare the staffing proposal or the corrective action plan. SOF ¶ 40. No reasonable jury could find that the Recap Email resulted in any "discrete change" to her employment terms. *Id.* Rather, the Recap Email was similar to the communication at issue in *Gregg*, where the FMLA retaliation claim was premised on an email outlining performance expectations, which the plaintiff perceived as "hostile, threatening, and patronizing." *Gregg*, 743 F. Supp. 3d at 270. The Court rejected the claim, finding that the email, which merely communicated expectations for the upcoming year, neither disciplined, demoted, or nor denied the plaintiff any professional opportunities, and thus did not constitute a materially adverse action. *Id.* at 279. Just as in *Gregg*, the Recap Email here did not discipline or demote Ms. Harvey, nor did it deny her any professional opportunities—it merely set expectations, and therefore was not a materially adverse action as a matter of law.

Moreover, the Recap Email was drafted before Ms. Johnston became aware, on December 5, that Ms. Harvey would be going out on continuous FMLA leave. SOF ¶¶ 34-35. It is axiomatic than an action that precedes protected conduct is not taken because of the protected conduct and thus cannot be retaliatory. *Chase v. U.S. Postal Serv*., 843 F.3d 553, 559 (1st Cir. 2016) (citing *Ameen*, 777 F.3d at 70). And though Ms. Johnston ultimately sent the Recap Email a day later, nothing in the record indicates that she sent it not to recap their prior discussion—a legitimate, non-retaliatory reason—but rather in retaliation for Ms. Harvey's upcoming leave.

Third, neither the above nor anything else MIT did prevented Ms. Harvey from returning from leave, much less constituted a "constructive discharge" as the Complaint asserts. To show constructive discharge, a plaintiff must demonstrate working conditions that were not merely hostile, but "so intolerable that [her] decision to resign was void of choice or free will" and "her

only option was to quit." *E.E.O.C. v. Kohl's Dep't Stores, Inc.,* 774 F.3d 127, 134 (1st Cir. 2014) (internal quotations omitted); *see also GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34–35 (1995) (same under Mass. law)). Changes during an employee's long-term absence are not themselves indications of discrimination. *See Keeler v. Putnam Fiduciary Tr. Co.*, 238 F.3d 5, 10 (1st Cir. 2001) ("An employee's use of leave" may "require an employer to implement changes in how jobs are assigned and who does what within the organization."). A plaintiff who is not in contact with the workplace for months before quitting, or who "sever[s] the relationship without giving the employer a chance to resolve the issues between them" cannot prevail on a constructive discharge claim. *See, e.g., Green-LaRoche*, 2019 WL 5100407, at *6 (granting summary judgment where the plaintiff "was on paid leave for the three months immediately preceding her resignation" and did not give the employer "a chance"); *see also Stratton v. Bentley Univ.*, 113 F.4th 25 (1st Cir. 2024).

No reasonable jury could find that the record described in Section IV.A above shows such "intolerable" working conditions that Plaintiff had no choice but to quit. Indeed, Plaintiff did not resign: she took FMLA leave and was terminated after she had exhausted her available leave and could not return to work. Any suggestion that Ms. Harvey felt inhibited from returning due to supposed changes during her absence is a non-starter, both because she testified to not knowing whether they would have impacted her had she ever tried to return, and because any such changes are insufficient to show hostility. Further, Plaintiff was on leave and absent from the workplace for over six months before the termination. Finally, Plaintiff can present no evidence that she gave MIT the "chance to resolve the issues" she believes had arisen, since she never spoke with Ms. Johnston or Ms. Giddarie about the Recap Email, went on leave, and never sought to return.

In short, Ms. Harvey cannot produce any evidence of retaliatory animus relating to her FMLA leave. Accordingly, her FMLA retaliation claim must be dismissed.

## V. CONCLUSION

For the foregoing reasons, MIT respectfully requests that this Court grant its Motion for Summary Judgement and dismiss the Complaint in full.

Dated: October 27, 2025

Respectfully submitted,

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY,

By its attorneys,

*/s/ Alexandra D. Thaler*
Alexandra D. Thaler (Bar No. 677785)
David C. Kurtz (Bar No. 641380)
Patrice C. Dixon (Bar No. 690337)
Constangy Brooks, Smith & Prophete LLP
800 Boylston Street, Suite 1005
Boston, MA 02199
Telephone: 617.849.7880
*adthaler@constangy.com*
*dkurtz@constangy.com*
*pdixon@constangy.com*

**CERTIFICATE OF SERVICE**

I, Alexandra D. Thaler, hereby certify that, on October 27, 2025, a true and correct copy of the foregoing document was electronically filed through the Court's CM/ECF system and served on all parties as indicated in the Notice of Electronic Filing (NEF).

*/s/ Alexandra D. Thaler*