UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REGINA HARVEY,<br><br>*Plaintiff,*<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>*Defendant.* | Civil Action No.: 1:24-cv-11741-DJC |

**DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56(c)(1), LR 56.1, Defendant Massachusetts Institute of Technology ("MIT") submits its Rule 56.1 Statement of Material Facts in support of its Motion for Summary Judgment.[1]

## I. MIT and MIT Health

1. MIT is a private research university located in Cambridge, Massachusetts. Ex. 1 (Affidavit of Thanh Giddarie ("Giddarie Aff.")), ¶ 2.[2]

2. MIT Health, previously known as MIT Medical, is an accredited full ambulatory care center on the MIT campus serving the MIT community, including students, faculty, employees, and their families. Ex. 1 (Giddarie Aff.), ¶ 3.

3. MIT Health also operates a facility in Lexington, Massachusetts that provides medical services to members of the MIT community who live and/or work in that area. Ex. 1 (Giddarie Aff.), ¶ 4.

[1] MIT treats the referenced facts as undisputed *solely* for purposes of its present Motion for Summary Judgment, without prejudice to its ability to dispute any facts at any trial of the matter.
[2] References to Exhibits ("Ex. __") are to the documents attached as exhibits to the Affidavit of Alexandra D. Thaler, Esq., submitted in support of MIT's Motion for Summary Judgment, and are followed by a brief description of the document for the Court's ease of review.

4. MIT Health employs licensed health care providers, including physicians and nurses, as well as other support staff, such as Patient Services Representatives (PSRs) who provide patient support, and Clinical Administrative Specialists, who provide administrative support to providers. Ex. 1 (Giddarie Aff.), ¶ 5.

## II. Plaintiff's Employment with MIT

5. Regina Harvey ("Ms. Harvey" or "Plaintiff") began her employment at MIT as a Nurse Practice Manager for Primary Care within MIT Health on October 5, 2020. Ex. 2 (cited pages of transcript of Deposition of Regina Harvey ("Harvey Dep.")), 62:15-16; Ex. 3 (Harvey Offer Letter, MIT02242-43), p. 2. Her responsibilities included oversight of the Lexington Primary Care site. Ex. 2 (Harvey Dep.), 67:16-18.

6. Ms. Harvey identifies as Black. Ex. 4 (Harvey Dep. Ex. 11, MCAD Charge, MIT02253-54) ¶ 1; see also, e.g., Ex. 2 (Harvey Dep.), 159:23-160:1.

7. Ms. Harvey's direct supervisor throughout her employment with MIT Health was Maureen Johnston, Director of Clinical Operations and Chief of Nursing. Ex. 2 (Harvey Dep.), 67:23-68:3; 72:14-17; Ex. 1 (Giddarie Aff.), ¶¶ 6, 9.

8. Ms. Johnston is a White woman from Northern Ireland. Ex. 1 (Giddarie Aff.), ¶ 8.

9. As Ms. Harvey's direct supervisor, Ms. Johnston participated in and approved Ms. Harvey's hiring in 2020. Ex. 1 (Giddarie Aff.), ¶ 9.

10. In July 2021, Ms. Johnston rated Ms. Harvey a 5 out of 5. Ex. 5 (Harvey 2021 performance review, MIT00008-9).

11. In the fall of 2021, Ms. Johnston promoted Ms. Harvey to the position of Associate Director of Nursing, Clinical Operations, which involved a change in job title, a pay raise, and additional responsibilities. Ex. 2 (Harvey Dep.), 69:23-70:16, 71:14-72:13; Ex. 1 (Giddarie Aff.), ¶ 10.

12. As Associate Director, Ms. Harvey had responsibility over Pediatrics and Adult Primary Care, Family Medicine, and Population Health, and over referrals. Ex. 2 (Harvey Dep.), 72:6-73:5, 73:23-74:1; Ex. 1 (Giddarie Aff.), ¶ 10.

13. At the same time, Ketline Edouard was also promoted to the position of Associate Director of Nursing, Clinical Operations, with responsibility over specialty clinics and Urgent Care. Ex. 2 (Harvey Dep.), 71:3-6; 73:10-14; Ex. 1 (Giddarie Aff.), ¶ 11.

14. Ms. Edouard is Black. Ex. 2 (Harvey Dep.), 160:17-20; Ex. 1 (Giddarie Aff.), ¶ 11.

15. In connection with the promotion to Associate Director, Ms. Harvey received a pay increase of 13% effective October 1, 2021. See Ex. 6 (Harvey HR Appointment History, MIT02251-2).

16. Following further assessment, Ms. Harvey received an additional pay increase of 3% of the new salary, effective December 1, 2021. See Ex. 6 (Harvey HR Appointment History, MIT02251-2).

17. In June 2022, Ms. Johnston rated Ms. Harvey a 4 out of 5. Ex. 7 (Harvey 2022 performance review, MIT00010-12), p. 3.

18. Also in May 2022, Ms. Johnston rated Ms. Edouard a 5 out of 5. Ex. 8 (Johnston May 6, 2022 email, MIT02474-5), p. 2.

19. Ms. Harvey's goals for 2022-23 (the "Goals Document"), prepared by Ms. Johnston in August 2022, did not include a requirement that she attend a conference; rather, the goals indicated that Ms. Harvey should, among other things: "Attend a conference or other learning event" by "March 2023." Ex. 9 (Johnston Aug. 9, 2022 email with attachment, MIT01391-94), p. 5 (emphasis added). By contrast, Ms. Johnston's goals for herself stated she should: "Attend a

conference" by "End May 2023." Id., p. 3. Nothing in the Goals Document required Ms. Harvey to participate on committees. See id., pp. 4-5.

20. In 2022, Ms. Johnston had six direct reports: Ms. Harvey and Ms. Edouard, who identify as Black, Janice Puibello and Maura Rowley, who identify as White, one individual who identifies as Hispanic, and one individual who identifies as being of more than one race. Ex. 1 (Giddarie Aff.) ¶ 20; Ex. 2 (Harvey Dep.), 110:9-10, 167:17-23.

21. Ms. Johnston was "very kind" to Ms. Harvey "in the beginning" and they had a "positive relationship." Ex. 2 (Harvey Dep.), 156:2-4, 162:3. For example, Ms. Johnston gave Ms. Harvey gifts on her birthday and at Christmas and sent Ms. Harvey text messages thanking her or saying other complimentary things. Id. 162:4-6, 206:9-12.

22. By way of further example:

- Following the successful implementation of a nursing initiative, Ms. Johnston wrote to Ms. Harvey on May 23, 2022 stating, "Hi Regina Thank you for all your help and support in making this happen." Ex. 10 (Johnston May 23, 2022 email, MIT01711-12), p. 2;
- On October 26, 2022, when Ms. Harvey suggested she wanted to update some workflows in partnership with a project manager and asked Ms. Johnston for her thoughts, she responded, "Hi Regina That is very helpful. I know Marcela Cardoso, project manager would be keen to partner with you. Will you follow up with her or should I?" Ex. 11. (Johnston October 26, 2022 email, MIT01397).; and
- In response to Ms. Harvey notifying the Primary Care staff that Halloween treats had been left for them at workstations, Ms. Johnston wrote to Ms. Harvey on October 31, 2022 stating, "Happy Halloween Too cute[.]" Ex. 12 (Johnston Oct. 31, 2022 email, MIT01461).

23. Ms. Harvey considered that "one day, [Ms. Johnston] just changed." Ex. 2 (Harvey Dep.), 162:7-9.

24. Ms. Harvey has provided multiple different timeframes for when this "change" occurred, ranging from August 2021 or Fall 2021 or October 2021, to May 2022, or after her vacation in August 2022, or after resignations in September 2022. Ex. 2 (Harvey Dep.), 163:2-

165:4 (Ms. Johnston's behavior toward her "[s]tarted changing" in "around August of 2021—2022" and referring to taking on pediatrics, primary care and family medicine which occurred in 2021); id. 162:7-9 (Ms. Johnston's "attitude" toward her changed after her promotion to the Associate Director position, which occurred in Fall 2021); id.163:6-13, 164:6-10 (Ms. Johnston's behavior changed ahead of an inspection by The Joint Commission, when Ms. Harvey complained that she was having to clean up the Pediatrics department that had been left in "terrible condition . . . under Ketline Edouard's management"); id. 183:14-19 (Ms. Johnston's "target[ing] and bull[ying]" "started" in the "summer" of 2022, "around May" of 2022); id. 152:8-10 (Ms. Johnston's "whole attitude changed" when Ms. Harvey returned from vacation, which was August 22 through September 5, 2022 (Ex. 1 (Giddarie Aff.), ¶ 29)); Ex. 4 (MCAD Charge), ¶ 2-3 (Ms. Johnston had "targeted and bullied" her since certain nurse resignations in May and September 2022).

25. The Joint Commission inspection occurred in October 2021, and there was no further inspection during Ms. Harvey's employment. Ex. 1 (Giddarie Aff.) ¶ 12.

26. Ms. Harvey considered that "the leadership team" "started treat[ing] her differently" the week of November 21 or 22, 2022. Ex. 2 (Harvey Dep.), 171:12-21.

## III. Concerns Regarding Ms. Harvey's Management of Primary Care

27. Ms. Harvey was the supervisor for the Nurse Practice Supervisors (NPS) in her department, including Pauline Yee. Ex. 2 (Harvey Dep.), 217:9-11; See id. 227:2-10. The NPSs managed other employees. See id. 74:6-8. At this time, none of the NPSs reporting to Ms. Harvey was Black. Ex. 1 (Giddarie Aff.) ¶ 31.

28. In 2022, employees "were complaining about Ms. Yee all the time." Ex. 2 (Harvey Dep.), 217:17-22. When Ms. Johnston had problems with Ms. Yee, she would want Ms. Harvey to address them. Ms. Harvey would tell Ms. Johnston that she could not address them and that Ms.

Johnston would have to address them herself. This was because Ms. Harvey had been on vacation or away. Id. 217:3-22.

29. In late April 2022, Ms. Johnston solicited feedback from nurses in Primary Care regarding their level of satisfaction with their work, suggestions for improvement, and other related matters. Ex. 13 (Johnston May 22, 2022 email, MIT01686-87). By email and in a meeting with Ms. Harvey, Ms. Johnston conveyed the results of the feedback to the staff and to Ms. Harvey, noting that the "common issues identified" included poor internal communication, not being included in decision-making, and workload and training concerns. Id. p. 3.

30. Between February and October 2022, seven nurses within Primary Care and Family Medicine, under Ms. Harvey, left their full-time positions with MIT Health to take other jobs or to become part time per diem only employees. Ex. 1 (Giddarie Aff.) ¶ 13; Ex. 2 (Harvey Dep.), 84:10-85:14, 88:15-89:11.

31. In November 2022, a patient complaint arose (the "November Patient Complaint"). Ms. Johnston questioned Ms. Harvey regarding why she had not responded to it. Ex. 2 (Harvey Dep.), 172:2-5, 273:23-24. Ms. Harvey considered that the PSR supervisor, Tonya Givens, "should have been taking care of" it as Ms. Harvey was away from work at that time. Ex. 2 (Harvey Dep.), 172:2-10.

32. Also in November 2022, Ms. Johnston emailed Ms. Harvey regarding a complaint relating to coverage at the Lexington primary care site and asked Ms. Harvey to "handle it" (the "November Coverage Issue"). Ex. 14 (Johnston Nov. 7, 2022 email, HARVEY00185). Ms. Harvey stated that Ms. Johnston behaved as if the situation were her "fault," which Ms. Harvey considered was not the case. Ex. 2 (Harvey Dep.), 210:16-21.

33. On November 22, 2022, Ms. Johnston and MIT Health Director of Human Resources Thanh Giddarie met with Ms. Harvey and discussed her performance. Ex. 2 (Harvey Dep.), 227:21-228:3; 266:12-267:19. During this meeting, Ms. Johnston described several concerns, including Ms. Harvey's handling of medical assistants, her relationship with Ms. Edouard, and certain other matters, including the November Patient Complaint and the November Coverage Issue. Id. 212:6-9, 267:14-270:14, 273:12-274:7.

34. On December 1, 2022, Ms. Giddarie wrote to Ms. Johnston with a proposed message to Ms. Harvey regarding the November 22, 2022 meeting (the "December 1 Recap Draft"). Ex. 15 (Giddarie/Johnston Dec. 2022 emails, MIT01475-76), p. 3. The December 1 Recap Draft included a discussion of the three topics that Ms. Johnston had identified when scheduling the meeting with Ms. Harvey on November 21. Ex. 15 (Giddarie/Johnston Dec. 2022 emails, MIT01475-76), p. 3 ("The patient relations issue, you provided inaccurate information…"; "Communication – there seems to be confusion among your team as to changes in policy and process at Medical…"; "Your role as the Associate Director of Clinical is to manage and implement changes, the CJP project is still not completed. . . ."); Ex. 16 (Johnston Nov. 21, 2022 email, MIT01435) (citing "patient relation issue," "communication" and "your role"). The December 1 Recap Draft concluded with an instruction that Ms. Harvey was to "review [her] job description and provide a corrective action plan within the next 2 weeks." Ex. 15 (Giddarie/Johnston Dec. 2022 emails, MIT01475-76), p. 3.

35. On December 4, at 3:46 p.m., Ms. Johnston responded to Ms. Giddarie. Ex. 15 (Giddarie/Johnston Dec. 2022 emails, MIT01475-76), p. 2. Ms. Johnston wrote that Ms. Giddarie's "narrative is straightforward and appropriate," noted that she added two additional bullets regarding operations and staffing, and indicated that if Ms. Giddarie did not have further

comments, she intended to send it to Ms. Harvey in the morning. Id. Within the bullet on staffing, Ms. Johnston wrote that Ms. Harvey "need[ed] to prepare a written, thoughtful proposal with supporting justification on staffing for the Primary Care department[.]" Id. Ms. Johnston's December 4 draft retained Ms. Giddarie's proposed statement regarding preparing a corrective action plan. Id., p. 3.

36. At 4:15 p.m. on December 4, Ms. Harvey sent Ms. Johnston an email, stating that she wanted to speak with Ms. Johnston the following day "regarding [her] FMLA." Ex. 17 (Harvey/Johnston Dec. 4, 2022 emails, MIT01470). Ms. Johnston responded to Ms. Harvey, confirming they would connect the next day. Id.

37. On Monday, December 5, Ms. Harvey wrote to Ms. Johnston, stating: "As we discussed this afternoon, I am going to be taking an [sic] FMLA starting Monday, December 12, 2022." Ex. 18 (Harvey Dep. Ex. 16, Harvey Dec. 5, 2022 email, MIT01129).

38. Ms. Johnston understood that Ms. Harvey would be "taking a two week leave of absence" starting December 12. Ex. 19 (Johnston Dec. 6, 2022 email, MIT01396).

39. On December 6, 2022 at 7:18 a.m., Ms. Johnston sent Ms. Harvey an email with a recap of their November 22 discussion. Ex. 20 (Harvey Dep. Ex. 17, "Recap Email," MIT01362-63); Ex. 2 (Harvey Dep.), 256:20-257:1; see also, id. 266:12-267:13. The only changes from the December 4 draft were (1) adjustments to the phrasing within the bullet on staffing; (2) adjustment to the timing for the corrective action plan due date, from "within the next 2 weeks" to "by the end of the year"; and (3) addition of a statement that Ms. Johnston was "very willing to support and help [Ms. Harvey] in working towards success. Ex. 20 (Recap Email) p. 2.

40. Ms. Harvey testified that after she told Ms. Johnston about her leave, Ms. Johnston "sent [her] this recap letter telling [her] all the things that [Ms. Johnston] wanted [her] to do before

[she] went on FMLA." Ex. 2 (Harvey Dep.) 255:15-18. She later explained that what she was referring to was the instruction to "provide a corrective action plan by the end of the year." Id. 285:20-286:3. Subsequently, she testified that Paragraph 32 of the Complaint, which states, "At the end of that e-mail, Ms. Johnston made a long list of tasks that she demanded that Ms. Harvey complete during her leave" refers to the "written, thoughtful proposal" regarding staffing. Id. 288:21-289:12.

41. Ms. Harvey never discussed the recap email with Ms. Johnston or anyone else. Ex. 2 (Harvey Dep.) 256:6-13; 294:7-10.

42. At 8:56 a.m. that morning, Ms. Harvey wrote to Ms. Johnston that she was "not feeling well" and was "going to take [sic] FMLA day[.]" Ex. 21 (Harvey/Johnston Dec. 6, 2022 emails, MIT01526). Ms. Johnston responded: "Thank you Regina. Hope you feel better soon. Take care[.]" Id.

43. The next day, Wednesday, December 7, Ms. Harvey again informed Ms. Johnston that she was "not feeling well" and would not be coming in to work. Ex. 22 (Harvey/Johnston Dec. 7, 2022 emails, MIT01473). Ms. Johnston responded: "Hi Regina Sorry to hear you are not well. Please let me know if I can help with anything." Id.

44. On Thursday December 8, and again on Friday, December 9, Ms. Harvey asked Ms. Johnston if she could work remotely, "for work life balance and health reason [sic]" and "to complete any workflows, emails or follow-ups . . . ." Ex. 23 (Harvey/Johnston Dec. 8-9, 2022 emails, MIT01501-02). Ms. Johnston approved both requests. Id.

## IV. Plaintiff's Medical Concerns, Extended Medical Leave, and Failure to Return to Work

45. At all relevant times, MIT contracted with Workpartners Absence Management Unit ("Workpartners") to administer MIT's leave policies and programs, including FMLA leave.

See Ex. 1 (Giddarie Aff.) ¶ 14; Ex. 24 (cited pages of transcript of Deposition of Thanh Giddarie ("Giddarie Dep.")), 129:3-17.

46. In fall 2022, Ms. Harvey experienced a number of medical and personal concerns, including a bout with Covid that was a "bad ordeal," an issue with her arm that caused her to wear a splint, significant pain and migraines. Ex. 2 (Harvey Dep.) 151:16-17, 158:18-24; Vol. III, 32:9-34:6, Vol. III 36:16-37:11. She also experienced grief from the deaths of "[a] few people" she knew. Id. 302:14-19.

47. In fall 2022, Ms. Harvey submitted an application for FMLA leave, which was later approved. Ex. 25 (Harvey/Workpartners Nov. 21, 2022 email,[3] MIT001944-47); Ex. 26 (Harvey/Workpartners Dec. 5, 2022 email, MIT01972-74), p. 3.

48. On December 5, Ms. Harvey notified Workpartners that her provider would be submitting additional documentation to support updating the leave request to be one for continuous FMLA leave. Ex. 26 (Harvey/Workpartners Dec. 5, 2022 email, MIT01972-74), p. 2; see Ex. 1 (Giddarie Aff.), ¶ 14.

49. Ms. Harvey began her continuous FMLA leave on Monday, December 12, 2022. Ex. 2 (Harvey Dep.), Vol. III 43:16-20.

50. As of December 9, 2022, Ms. Harvey's leave was approved through January 9, 2023. Ex. 27 (Workpartners Dec. 9, 2022 notice, MIT00940-41), pp. 2-3. Thereafter, Ms. Harvey's leave was extended multiple times. Id. Vol. III 43:21-44:22; Ex. 28 (Workpartners Jan. 9, 2023 notice, MIT00948-49), p. 2 (extending leave through February 10), Ex. 29 (Workpartners Feb. 7, 2023 notice, MIT00956-57), p. 2 (extending leave through March 10), Ex. 30 (Workpartners Mar. 28, 2023 notice, MIT00887-89), p. 2 (noting leave approved through April 10, 2023), Ex. 31

[3] Attachment containing confidential health information omitted.

(Workpartners May 18, 2023 notice, MIT00896-99), p. 2 (noting leave approved through June 12, 2023), Ex. 32 (Workpartners Jun. 9, 2023 notice, MIT00972-73) p. 3 (extending leave through June 19, 2023).

51. From December 2022 onward, Ms. Harvey was not denied any leave request she submitted. Ex. 2 (Harvey Dep.), Vol. III 47:24-48:3.

52. Ms. Harvey remained on leave through June 19, 2023, for a total of 27 weeks. Ex. 1 (Giddarie Aff.), ¶ 15.

53. During the entirety of her approved leave, Ms. Harvey received 100% of her salary through the application of Sick Leave and MIT's policy called "Transitional Salaried Serious Illness Pay," which paid 100% of salary for all salaried employees who, like Ms. Harvey, were hired before December 31, 2020. Ex. 1 (Giddarie Aff.), ¶ 16; See Ex. 33 (Pay stubs dated Jul. 15, 2022 through Dec. 30, 2022, MIT02161-72) and Ex. 34 (Pay stubs dated Jan. 1, 2023 through Jun. 15, 2023, MIT02187-98) (indicating same gross wages each pay period both before and throughout Ms. Harvey's approved leave).

54. Workpartners confirmed to Ms. Harvey on May 18, 2023 that if she could not return to work at the end of her approved leave and she was not qualified for a reasonable accommodation, her employment would be terminated due to unavailability for work. Ex. 35 (Workpartners/Harvey May 18 and 22, 2023 emails, MIT01489-92), p. 4. The notice also provided instructions for seeking a reasonable accommodation and referred to prior instructions for applying for long term disability (LTD) benefits. Id.

55. Ms. Harvey did not submit the documentation needed to seek a reasonable accommodation. Ex. 1 (Giddarie Aff.) ¶ 17. Rather, by email dated May 22, 2023, Ms. Harvey notified Workpartners and Ms. Johnston that she had submitted an application for LTD benefits,

thus indicating she would be remaining out of work. Ex. 35 (Workpartners/Harvey May 18 and 22, 2023 emails, MIT01489-92), p. 2.

56. Ms. Harvey's LTD benefits were ultimately approved. See Ex. 2 (Harvey Dep.) 279:2-280:3.

57. As of her deposition, Ms. Harvey remained unable to work. Ex. 2 (Harvey Dep.), 305:19-21; Vol. III 46:24-47:3.

58. Ms. Harvey never sought to return to work at MIT "because . . . [she] wasn't in mental health [sic] . . . and physically good health to come back to work." Ex. 2 (Harvey Dep.), 278:6-19.

59. Ms. Harvey's employment was terminated effective June 20, 2023 due to her unavailability for work and in accordance with MIT policy. Ex. 36 (Moorghen Jun. 20, 2023 letter, MIT01581).

60. Initially during Ms. Harvey's FMLA leave, her duties were covered by Ms. Johnston and others. Ex. 1 (Giddarie Aff.) ¶ 18. After her leave was extended, Ms. Johnston asked Ms. Edouard to take on oversight of Primary Care on an interim basis pending Ms. Harvey's return. Id. Ms. Eduard did not retain these duties on a permanent basis until after the termination of Ms. Harvey's employment: she became Associate Chief of Nursing, overseeing Primary Care, Urgent Care and Medical Specialties effective July 5, 2023. Ex. 1 (Giddarie Aff.) ¶ 19

61. At some point Ms. Harvey saw emails indicating changes to some positions at MIT Health. She first testified that these were the basis for her assertion that she was prevented from returning to work (Ex. 2 (Harvey Dep) 275:18-276-1), but then confirmed that "[n]othing changed for [her]," (id. 276:2-6), and as she was still on leave she "do[es]n't know what the outcome would have been" if she had ever sought to return (id. 278:4-5).

## V. Alleged Conduct Purportedly Creating a Hostile Work Environment

62. During her employment with MIT Health, Ms. Harvey participated on the Ambulatory Safety Net (ASN) working group, relating to population health. The other participants were Michele David, M.D., and Ms. Puibello. Ex. 2 (Harvey Dep.), 103:2-9, 167:3-5.

63. On September 12, 2022, Dr. David announced that Nicole Napier, who was then a nurse in the OB/GYN department and identifies as Black, had been appointed position of program manager for the Ambulatory Safety Net (ASN), taking the title Manager, Population Health Program. Ex. 2 (Harvey Dep.), 166:13-16; Ex. 37 (David Sep. 12, 2022 email, MIT01291-92) p. 3; Ex. 1 (Giddarie Aff.) ¶ 21.

64. On June 18, 2022, Ms. Johnston removed Ms. Harvey from the ASN committee, explaining that Ms. Napier was going to participate on the ASN committee instead of Ms. Harvey and that Ms. Harvey was no longer needed. Ex. 38 (Johnston Sep. 19, 2022 email, MIT01376); Ex. 2 (Harvey Dep.), 167:3-14. Ms. Johnston did not remove Ms. Puibello from the ASN Committee. Ex. 2 (Harvey Dep.), 170:19-22.

65. On September 26, 2022, Ms. Johnston removed Ms. Harvey from the STI Clinic. Ex. 2 (Harvey Dep.), 167:15-23; see Ex. 39 (Johnston Sep. 26, 2022 email, MIT01494). In an email to Ms. Harvey, Ms. Rowley, Colleen McDonald (then-Associate Chief of Nursing, Student Health), and Shawn Ferullo, M.D. (then-Director of Student Health and Chief of Sports Medicine and Orthopedics), Ms. Johnston explained that Ms. Rowley would take on the STI Clinic coordination role because she was transitioning to being "solely focused on student health," and the STI clinics were a program relating to student health Ex. 39(Johnston Sept. 26, 2022 email, MIT01494); see Ex. 1 (Giddarie Aff.) ¶¶ 7, 23.

66. Ms. Rowley's title changed from Nurse Practice Manager to Student Health Nurse Manager as of November 28, 2022. Ex. 1 (Giddarie Aff.) ¶ 22.

67. At some point, Ms. Johnston indicated to Ms. Harvey that she was going to remove Ms. Harvey from another group because she wanted Ms. Harvey to focus on Primary Care. Ex. 2 (Harvey Dep.), 197:8-12.

68. Ms. Johnston initially told Ms. Harvey that she could not attend a conference for which the ASN committee had been preparing, and a week later told her that she could. Ex. 2 (Harvey Dep.), 104:4-24. Ms. Harvey did not attend this conference because "by then" she had "missed the deadline" for registration and "[she] wasn't going after the reaction [she] received from [Ms. Johnston]." Id. 105:1-9.

69. At some point, when Ms. Harvey requested to attend a conference relating to primary care, Ms. Johnston told her that she could not go because it was only for the executive leadership team. Ex. 2 (Harvey Dep.), 96:20-97:13.

70. Ms. Harvey was not a member of the executive or senior leadership team (Ex. 2 (Harvey Dep.) 98:6-8), which included Medical Director Cecilia Stuopis, M.D., Executive Director Brian Schuetz, Dr. Ferullo and Ms. Johnston. Ex. 2 (Harvey Dep.), 64:7-11, 70:11-16; 204:4-6; Ex. 1 (Giddarie Aff.) ¶ 7.

71. When Ms. Harvey subsequently asked Mr. Schuetz if she could "attend one of the primary care meetings that they had attended," he said she could. Thereafter, Ms. Johnston told Ms. Harvey that if she wanted to go to a conference, she could apply to do so. Ex. 2 (Harvey Dep.), 97:14-23.

72. During and after Ms. Harvey's employment, MIT Health maintained a policy regarding employee attendance at conferences, which required submission of a request form. Ex. 1 (Giddarie Aff.) ¶ 24; Ex. 40 (Harvey Dep. Ex. 9, MIT Medical Class, Conference & Travel Policy, MIT-1574-78), Ex. 41 (Harvey Dep. Ex. 10, MIT Health Advance Class, Conference &

Travel Request, MIT01549). Ms. Johnston referenced this policy in an email to Ms. Harvey dated October 18, 2022. Ex. 2 (Harvey Dep.), 109:2-18, 111:3-11; Ex. 42 (Harvey Dep. Ex. 8, Johnston Oct. 18, 2022 email, MIT01705) ("Permission to attend a conference and any associated travel or conference fees must be sought and approved in advance[.] If you look in policy tech and type in Education [in]to [a] search window, it shows all relevant policies.")

73. Ms. Harvey never submitted a conference request form to attend any conference. Ex. 1 (Giddarie Aff.) ¶ 25.

74. Ms. Harvey once requested a raise for Kim King, a Black female employee in the PSR role, supervised by Ms. Givens. Ex. 2 (Harvey Dep.), 199:14-200:4. Ms. Harvey asked for Ms. King's pay to match that of Stephen Pepin, a White male employee, who was then an administrative employee and who Ms. Harvey thought had "less experience." Id. 199:14-200:4.

75. Ms. Johnston and then-Director of Human Resources for MIT Health Catherine Tetreault declined to grant the raise, indicating that Ms. King's salary was commensurate with her years of experience. Ex. 2 (Harvey Dep.), 34:9-22; 199:16-201:7.

76. Mr. Pepin was initially hired as a PSR, and was paid the same rate in that role as Ms. King had been when she had been hired as a PSR. Ex. 1 (Giddarie Aff.) ¶ 26. Prior to Mr. Pepin joining MIT Health, Ms. King had been promoted to the role of Lead PSR, and had received a pay increase, such that she was paid more than Mr. Pepin at the time he was hired. Id. ¶ 27.

77. Mr. Pepin later sought and was selected for promotion to the role of Clinical Administrative Specialist. Ex. 1 (Giddarie Aff.) ¶ 28. That role provides administrative support and scheduling services to providers, rather than patient-facing services. Id.

78. Ms. Harvey may have asked to raise the pay for medical assistants, some of whom were Black, which was not approved. Ex. 2 (Harvey Dep.) 201:19-202:3.

79. Once in the fall of 2022, Ms. Harvey emailed Ms. Johnston informing her that she was leaving for the day. Ex. 2 (Harvey Dep.), 158:18-24. Ms. Johnston responded, by e-mail and verbally, that if Ms. Harvey was going to be out, to "please let her know," noting that other people did so and naming those individuals. Id. 159:1-6.

80. All the individuals Ms. Johnston named as having to notify her of their absences were White, except Ms. Johnston also referenced Ms. Edouard. Ms. Johnston also noted she tells her own boss when she leaves. Ex. 2 (Harvey Dep.), 159:7-11, 161:17-24.

81. At her deposition, Ms. Harvey agreed that "what [Ms. Johnston] was saying is, because . . . these other employees who are [W]hite had to notify her when they were leaving, she was asking [Ms. Harvey] to also notify her when [Ms. Harvey] was leaving." Ex. 2 (Harvey Dep.), 160:23-161:4.

82. Ms. Johnston once asked Ms. Harvey to get spirometer training for some employees, and Ms. Harvey identified three individuals. Ex. 2 (Harvey Dep.), 223:19-224:6.

83. The three individuals Ms. Harvey identified were the three Lead Medical Assistants and the training was in Connecticut . Ex. 43 (Harvey Aug. 19, 2022 email) (referring to spirometry training in Connecticut); see also Ex. 2 (Harvey Dep.), 108:16-109:1.

84. Ms. Johnston later changed her mind and said they would not go. Ex. 2 (Harvey Dep.), 223:19-224:6. But see id., 108:16-109:1 ("I sent . . . medical assistants . . . for a spirometry training in Connecticut").

85. At some point, two or three nurses who reported to Ms. Yee complained to Ms. Johnston about "leadership." Ms. Johnston brought this to Ms. Harvey's attention indicating that Ms. Harvey was "leadership." Ex. 2 (Harvey Dep.), 78:21-24, 79:7-12. When Ms. Harvey asked the nurses about whom they considered to be leadership, they said, "You know, you, [Ms.

Johnston], and the people upstairs." Ms. Harvey responded, saying "it was referenced that that I'm leadership." The nurses then stated it was not her, but "leadership in general." Ex. 2 (Harvey Dep.), 79:13-24.

86. At her deposition, Ms. Harvey asserted that "if there was a nursing shortage" in another department jobs were "posted instantly" whereas if her department had a shortage, she had to "give a report, statistics, or just speak up again" and "some . . . e-mails would be not answered, and some of them would be answered." Ex. 2 (Harvey Dep.), 156:7-13. This occurred on three occasions in 2022. Id., 157:16-23.

87. The other department referenced by Ms. Harvey as having its open positions filled more quickly was headed by Ms. Edouard. Ex. 2 (Harvey Dep.), 157:4-158:3.

88. At some point, Ms. Harvey made a suggestion regarding workflow that was not accepted, but when someone who was White made the same suggestion "four to six months later" it was accepted. Ex. 2 (Harvey Dep.), 208:3-16.

89. When pediatricians complained, Ms. Johnston "at times, would side with the pediatricians." Ex. 2 (Harvey Dep.), 165:7-11.

90. On October 27, 2022, Ms. Harvey asked to speak with Ms. Johnston and Ms. Giddarie regarding raising the job grade of the Nurse Practice Supervisors (NPS). Ms. Harvey wanted them to be raised from a Grade 9 to a Grade 10 "because one of the nursing supervisors left her role to go to a new role, which was a Grade 10." Ex. 2 (Harvey Dep.), 147:1-9; 227:2-228:6; Ex. 44 (Harvey Oct. 27, 2022 email, MIT01290) (requesting a meeting "to discuss the NPSs (Nurse Practice Supervisor) job code for Primary Care vs. The Travel RN Program Manager"); Ex. 1 (Giddarie Aff.) ¶¶ 31, 32.

91. During their subsequent meeting (the "Job Grade Meeting"), Ms. Johnston and Ms. Giddarie explained to Ms. Harvey that job grades are changed based on an expanded scope or additional duties in a role. Ex. 2 (Harvey Dep.), 237:11-19; Ex. 1 (Giddarie Aff.) ¶ 32. Ms. Johnston and Ms. Giddarie told Ms. Harvey that the travel nurse manager position would have a broader scope than the NPS's and that if she wanted the NPS position upgraded, she would need to explain this in terms of the scope of the role. Id. 231:12-232:7; Ex. 1 (Giddarie Aff.) ¶ 32.

92. Ms. Harvey never provided the documentation to support her request for an increase to the NPS job grade. Ex. 1 (Giddarie Aff.) ¶ 33.

93. The November Patient Complaint was discussed at a subsequent meeting that included Dr. Stuopis, Mr. Schuetz, Ms. Johnston, Ms. Puibello, Pooja Khatri, Manager, Patient Experience, and Ms. Harvey (the "November Senior Leadership Meeting"). Ex. 2 (Harvey Dep.), 172:15-173:19; see Ex. 1 (Giddarie Aff.) ¶ 30. In this meeting, Ms. Khatri "made it look like [Ms. Harvey] was being singled out that [she] didn't follow the workflow," but Ms. Puibello stated that Ms. Harvey did not know about the relevant workflow. Id. 173:7-19. Ms. Khatri then apologized. Ex. 2 (Harvey Dep.), 173:20-21. Mr. Schuetz then asked to speak to the others in the meeting without Ms. Harvey and did not let her "say anything." Id. 173:20-174:4.

94. At her deposition Ms. Harvey confirmed that the sole basis for the allegation at paragraph 45 of the Complaint that "superiors" other than Ms. Johnston discriminated against her based on her race arising from her personal knowledge or experience is the November Senior Leadership Meeting. Ex. 2 (Harvey Dep.), 203:9-24.

95. Other than the conduct attributed to Ms. Johnston, and that during the November Senior Leadership Meeting, no other employee of MIT mistreated Ms. Harvey based on her race. Ex. 2 (Harvey Dep.), 250:18-23.

## VI. Alleged Comments Purportedly Creating a Hostile Work Environment

96. In 2020, Ms. Johnston told Ms. Harvey that Dr. David, who is Black, was "rough and tough," and that Dr. David "doesn't get along with anybody." Ex. 2 (Harvey Dep.), 142:21-143:4, 185:11-15. In the same timeframe, Ms. Johnston "may" have described Dr. David as "argumentative" or "aggressive" or "tough." Id., 150:1-11. Ms. Harvey testified that this was what is referred to in the allegation at Paragraph 22 of the Complaint, which states, "Ms. Johnston also made comments such as: black employees were 'rough and tough' compared to white employees," but admitted that Ms. Johnston did not compare Dr. David to White employees. Id., 184:16-185:21 ("She didn't compare her to other white people."); compare ECF No. 1-1 (Complaint) ¶ 22.

97. Ms. Harvey testified that she felt she got along with Dr. David. Ex. 2 (Harvey Dep.) 143:1-3.

98. In 2020, Ms. Johnston and Ms. Tetreault described Ms. Givens as Black and as "rough around the feathers" and "edgy." Ex. 2 (Harvey Dep.), 148:22-149:2.

99. Approximately six months after Ms. Givens became a supervisor, she sought a further promotion to the position of Practice Manager. Ex. 2 (Harvey Dep.), 148:5-13; 188:1-4. In discussing this request with Ms. Harvey, Ms. Johnston described Ms. Givens as "rough around the edges" and "uneducated" and stated she did not believe Ms. Givens was ready to be a practice manager. Ex. 2 (Harvey Dep.), 148:7-12.

100. At the time of Ms. Johnston's purported statement, Ms. Givens did not have a college degree and Ms. Johnston was not aware at that Ms. Givens had obtained some college credits. Ex. 2 (Harvey Dep.), 186:13-17.

101. In the Spring of 2021, an employee named Lakisha McNaughton applied for the role of Lead Medical Assistant but was not selected. Ex. 2 (Harvey Dep.), 189:10-15; Ex. 1

(Giddarie Aff.) ¶ 34. Ms. Johnston indicated she would not give Ms. McNaughton the role "for the way she acts. She's rough and loud." Ex. 2 (Harvey Dep.), 189:19-21.

102. Three other employees were selected for the lead role at that time. Two of the three individuals identify as Black; the other individual identifies as Hispanic/Latino. Ex. 1 (Giddarie Aff.) ¶ 35.

103. In a one-to-one meeting in 2021 or early 2022, Ms. Johnston and Ms. Harvey were discussing families and recent events. Ms. Johnston stated she had just come back from vacation and shared photos of her grandchildren. Ms. Harvey mentioned that she had seen her grandson and showed Ms. Johnston a picture of him. Ms. Johnston then asked if he was White, and Ms. Harvey replied that he was a person of color. Ex. 2 (Harvey Dep.), 146:11-17, 193:11-12, 193:22-194:3. Ms. Harvey felt "uncomfortable" with Ms. Johnston's question regarding her grandson's race. Id. 195:1-2.

104. On August 9, 2022, Ms. Johnston attended a meeting at which Ms. Harvey and another employee spoke to the nursing leadership team about basic leadership skills and other topics. Ex. 2 (Harvey Dep.), 145:6-23.

105. After the meeting, Ms. Johnston wrote Ms. Harvey an email stating: "Hi Regina[,] I greatly enjoyed this morning's leadership development session. You spoke very well and provided a great introduction and summary. . . ." Ex. 2 (Harvey Dep.), 145:6-23; Ex. 9 (Johnston Aug. 9, 2022 email with attachment, MIT01391-94), p. 2.

106. Immediately after the meeting, Ms. Johnston had approached Ms. Harvey and told her "the exact same thing." Ex. 2 (Harvey Dep.), 145:13-23. At her deposition Ms. Harvey first stated that Ms. Johnston had said she was "well-spoken" and later agreed that Ms. Johnston had said that she "spoke very well." Id. 254:12-15.

107. After certain nurse departures in May and September 2022, Ms. Johnston told Ms. Harvey that nurses were "leaving because of [her], because of [her] leadership." Ex. 2 (Harvey Dep.), 152:11-13. Ms. Johnston told Ms. Harvey she had an "autocratic style of leadership" and was "stern." Ex. 2 (Harvey Dep.), 152:20-22. Ms. Harvey disagreed with this characterization. Ex. 2 (Harvey Dep.), 152:23-153:1.

108. Shortly after the Job Grade Meeting Ms. Johnston told Ms. Harvey that she and Ms. Giddarie felt that Ms. Harvey had been "combative" and "aggressive" during the meeting. Ex. 2 (Harvey Dep.), 147:1-21. Ms. Harvey disagreed with this description of her conduct and indicated this to Ms. Johnston. Id. 147:22-23.

## VII. Additional Information Regarding Plaintiff's Experiences

109. Ms. Harvey felt she was removed from the ASN committee not because Ms. Napier, who is also Black, was appointed but "because of who [Ms. Harvey is]." Ex. 2 (Harvey Dep.), 198:19-199:3.

110. Ms. Harvey considered that when Ms. Johnston asked her to let her know when Ms. Harvey would be leaving work early in Fall 2022, she "was singling [Ms. Harvey] out for being a woman of color that day, for some reason." Ex. 2 (Harvey Dep.), 159:23-160:1.

111. Ms. Harvey believed the failure to give Ms. King a raise was because a Black woman had "sp[o]k[en] up" and asked for it. Ex. 2 (Harvey Dep.), 200:5-12.

112. More generally, Ms. Harvey believed Ms. Johnston was "singling [her] out as a [B]lack woman who spoke up, who talked about policies, who spoke up with leadership." Ex. 2 (Harvey Dep.), 169:3-5.

113. Ms. Harvey considered that the description of her as having been "aggressive" and "combative" during the Job Grade Meeting was connected to her race because it was directed to

her and because of the "tone" and "manner" in which it was said. Ex. 2 (Harvey Dep.), 242:5-9, 242:24-243:10.

114. Ms. Johnston never threatened Ms. Harvey, physically or otherwise. Ex. 2 (Harvey Dep.), 249:10-12, 250:2-6.

115. Ms. Johnston never publicly humiliated Ms. Harvey. Ex. 2 (Harvey Dep.), 249:21-250:1.

116. None of the instances in which Ms. Harvey felt she was mistreated based on her race had any impact on her work performance. Ex. 2 (Harvey Dep.), 250:8-12.

Dated: October 27, 2025

Respectfully submitted,

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY,

By its attorneys,

*/s/ Alexandra D. Thaler*

Alexandra D. Thaler (Bar No. 677785)
David C. Kurtz (Bar No. 641380)
Patrice C. Dixon (Bar No. 690337)
Constangy Brooks, Smith & Prophete LLP
800 Boylston Street, Suite 1005
Boston, MA 02199
Telephone: 617.849.7880
*adthaler@constangy.com*
*dkurtz@constangy.com*
*pdixon@constangy.com*

**CERTIFICATE OF SERVICE**

I, Alexandra D. Thaler, hereby certify that, on October 27, 2025, a true and correct copy of the foregoing document was electronically filed through the Court's CM/ECF system and served on all parties as indicated in the Notice of Electronic Filing (NEF).

*/s/ Alexandra D. Thaler*