UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REGINA HARVEY,<br>*Plaintiff,*<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br>*Defendant.* | No. 24-cv-11741-DJC |

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

LEVENSON, U.S.M.J.

INTRODUCTION

Before the Court is a motion for summary judgment filed by Defendant Massachusetts Institute of Technology ("MIT"), which seeks dismissal of all remaining claims[1] in this case.

Plaintiff Regina Harvey alleges that MIT, where Ms. Harvey worked as a nursing supervisor in MIT's ambulatory care center ("MIT Health"), subjected her to discriminatory treatment based upon race in violation of Mass. Gen. Laws ch. 151B. Specifically, Ms. Harvey alleges that she was subjected to a racially hostile work environment, created—for the most part—by her direct supervisor, Maureen Johnston ("Ms. Johnston").

[1] The Complaint initially included additional claims, which were dismissed upon MIT's motion to dismiss (Docket No. 8), pursuant to Judge Casper's order (Docket No. 17). Judge Casper allowed Count I to move forward to the extent that it alleged a hostile work environment claim based upon race. Count II also survived the motion to dismiss to the extent that it alleged a Family Medical Leave Act ("FMLA") retaliation claim. Ms. Harvey does not now contest MIT's Motion for Summary Judgement regarding her FMLA retaliation claim. *See* Docket No. 46 at 9. As a practical matter, only the hostile work environment claim remains for discussion.

With discovery now closed, MIT argues that there is no admissible evidence that could permit a reasonable finder of fact to conclude that MIT subjected Ms. Harvey to a racially hostile work environment. First, MIT contends that Ms. Harvey has failed to identify evidence that would support a finding that Ms. Harvey was subjected to severe or pervasive harassment in her work environment. Docket No. 43 at 8–11. Second, MIT contends that there is insufficient evidence to permit a finding that any of the conduct of which Ms. Harvey complains was motivated by, or infused with, racial animus. *Id.* at 12–16.

In support of its motion for summary judgment MIT has filed: a memorandum of law (Docket No. 43); a statement of material facts (Docket No. 44); an attorney's affidavit with 44 attached exhibits, which include an affidavit, various evidentiary documents (such as correspondence and personnel documentation), and excerpts from deposition testimony (Docket No. 45); and a reply brief (Docket No. 49). Ms. Harvey has submitted: a memorandum in opposition (Docket No. 46); an attorney's affidavit with 2 attached exhibits, which consist of Ms. Harvey's interrogatory answers and excerpts from Ms. Harvey's deposition (Docket No. 47); and a response to MIT's statement of material facts (Docket No. 48). Both MIT's statement of material facts and Ms. Harvey's response use the same paragraph numbers. I will cite to these, interchangeably, as "SOF." Obviously, only Plaintiff's response (Docket No. 48) reflects which statements have been disputed.

I have considered all of these materials, as well as the oral argument of counsel, in preparing this report and recommendation.

For the reasons set forth below, I recommend that the Court dismiss the remaining claims in this case because there is insufficient evidence to permit a reasonable finder of fact to

conclude that Ms. Harvey was subjected to any severe or pervasive harassment or to conclude that the purportedly harassing conduct was motivated by, or reflective of, racial animus.

## I. Facts

There are very few disputes about the facts of this case: who said what, or did what, on any given occasion. The parties disagree, however, about the reasonable inferences that a finder of fact could draw from those bare facts. The parties dispute whether a reasonable factfinder could conclude that various supervisory decisions, including some that Ms. Harvey characterizes as "micromanagement," together with various instances when Ms. Harvey's suggestions and recommendations were rejected, amounted to severe and pervasive harassment creating an abusive work environment. The parties also dispute whether there is sufficient evidence to permit a factfinder to conclude that Ms. Harvey was subjected to offensive, race-based conduct where Ms. Johnston criticized Ms. Harvey's "leadership," referred to Ms. Harvey on one occasion as "combative" and, on another occasion said she "spoke well" at a conference,[2] and on some occasions referred to particular Black employees (other than Ms. Harvey) as "rough and tough" or "rough around the edges."

### *A. Ms. Harvey's Employment with MIT*

MIT Health is an ambulatory care center with offices on the MIT campus and in Lexington, MA, which serves members of the MIT community. SOF ¶¶ 2–3.[3]

Ms. Harvey, who is Black, joined MIT Health in October 2020 as a Nurse Practice Manager for Primary Care with responsibilities including oversight of the Lexington site.

---

[2] The record, as discussed below, does not support the allegation in the Complaint that Ms. Johnston used the adjective "well-spoken" to describe Plaintiff on one occasion. Docket 1-1, Complaint ¶ 21.

[3] As noted above, citations to "SOF ¶ " refer interchangeably to MIT's Rule 56.1 Statement of Material Facts Not in Dispute (Docket No. 44) and to Plaintiff's response (Docket No. 48).

SOF ¶¶ 5–6. Ms. Harvey was hired by and reported to MIT Health's Director of Clinical Operations and Chief of Nursing. SOF ¶¶ 7–9. That individual, Ms. Johnston, is a White woman originally from Northern Ireland. *Id.*

In Ms. Harvey's July 2021 performance review, Ms. Johnston rated Ms. Harvey a five out of five. SOF ¶ 10. In the fall of 2021, Ms. Johnston promoted Ms. Harvey to Associate Director of Nursing, Clinical Operations, overseeing Primary Care, Family Medicine, Population Health, and referrals. SOF ¶¶ 11–12. The promotion led to a 13% pay increase, and following further assessment Ms. Harvey received an additional 3% increase of her new salary. SOF ¶¶ 15–16. At the same time, Ms. Johnston also elevated another Black nurse ("Ms. E") to the Associate Director level, giving her responsibility over specialty clinics and Urgent Care. SOF ¶¶ 13–14. In the June 2022 performance reviews, Ms. Johnston rated Ms. Harvey a four out of five; in May 2022, she rated Ms. E a five out of five. SOF ¶¶ 17–18.

As discussed below, on November 22, 2022, Ms. Johnston and the MIT Health Director of Human Resources ("Ms. G"), met with Ms. Harvey to discuss various matters relating to Ms. Harvey's job performance, and Ms. Johnston raised several concerns. SOF ¶ 33. The meeting was followed with a December 6, 2022, email from Ms. Johnston (which Ms. G and Ms. Johnston drafted between December 1 and December 6), which included a written corrective action plan that required Ms. Harvey to prepare a written staffing proposal for her department. SOF ¶¶ 34–41.

In the fall of 2022, Ms. Harvey submitted an application for FMLA leave for personal health challenges and was approved. SOF ¶¶ 46–47. On December 5, 2022, Ms. Harvey notified Ms. Johnston that she would be taking FMLA leave beginning the following week. SOF ¶ 37. Ms. Harvey began her leave on December 12, 2022, and her leave was repeatedly extended over

six months, through June 19, 2023. SOF ¶¶ 49–52. Throughout the 27 weeks Ms. Harvey was on leave, Ms. Harvey received 100% of her salary. SOF ¶¶ 52–53. During this time Ms. Harvey applied, and was approved, for long-term disability benefits. SOF ¶¶ 55–56. MIT terminated Ms. Harvey's employment as of June 20, 2023, due to her unavailability for work. SOF ¶ 59. Under the circumstances, she is not in a position to challenge her termination or otherwise oppose summary judgment on her FMLA claim.

Ms. Harvey's complaint alleged that MIT retaliated against Ms. Harvey for exercising her rights under the FMLA by sending her an email about her job performance and interfering with her return from leave. Docket No. 1-1, Complaint ¶¶ 32–34. This Court ruled that these retaliation allegations were sufficient to state a claim. Docket No. 17 at 9–10. At deposition, however, Ms. Harvey testified that she remained unable to return to work. SOF ¶ 57. Thus, at this stage of the case, Ms. Harvey concedes that she "is not in a position to pursue the FMLA retaliation claim." Docket No. 46 at 9. Accordingly, Count II of the Complaint is subject to dismissal.

### *B. Incidents of Alleged Harassment*

Ms. Harvey's claim that she was subjected to a hostile work environment relies primarily on the following incidents with respect to assignments, conferences, and suggestions for employee raises:

- In September 2022, Ms. Johnston removed Ms. Harvey from two committees so she could focus on Primary Care. She was replaced on the ASN (population health) committee, by a Black nurse who was hired as a population health manager; she was replaced on the committee for the STI Clinic, which was a student service, by a White nurse whose role was shifting to becoming solely focused on student health. SOF ¶¶ 62–67.

- Ms. Johnston indicated that Ms. Harvey could not attend two conferences, including one relating to the ASN committee work. Ms. Harvey was later told she *could* attend but would need to submit a request (as required by MIT policy). SOF ¶¶ 68–73. Ms.

Ms. Harvey did not submit any such requests but testified, in effect, that she had been discouraged from doing so by Ms. Johnston's reaction to her initial request. *Id.*

- Ms. Johnston declined Ms. Harvey's request for a raise for a Black employee to match that of a White employee, indicating that the Black employee's pay was commensurate with her experience. SOF ¶¶ 74–77. The two employees held different roles at that time. SOF ¶¶ 76–77.

- Ms. Harvey also asked to raise the pay for several medical assistants, some of whom were Black, and those raises were not approved. SOF ¶ 78.

- As Associate Director, Ms. Harvey had multiple direct reports including the Nurse Practice Supervisors (NPS) for her units, who in turn supervised other nurses. SOF ¶ 27.

- In fall 2022, Ms. Johnston declined to approve a job grade change for the NPSs under Ms. Harvey, none of whom were Black, unless Ms. Harvey submitted justification for the grade change request, which Ms. Harvey did not do. SOF ¶¶ 90–92.

- In fall 2022, after an occasion when Ms. Harvey gave short notice that she would need to leave work early, Ms. Johnston asked Ms. Harvey to give her advanced notice in the future. Ms. Johnston named others who gave advance notice, most of whom were White but Ms. Johnston named one who was Black, and Ms. Johnston noted that she herself gave advance notice to her boss. SOF ¶¶ 79–81.

- Ms. Johnston once asked Ms. Harvey to select employees for out-of-state spirometry training, but Ms. Johnston later indicated they would not go. SOF ¶¶ 82–84.

- Ms. Johnston assumed that when nurses whom Ms. Harvey supervised complained about "leadership" they meant Ms. Harvey, although they did not name her specifically and, when Ms. Harvey questioned those nurses, they denied that they meant her but rather "leadership in general." SOF ¶ 85.

- On three occasions in 2022, Ms. Johnston was slow to address personnel shortages in Ms. Harvey's department but was prompt in addressing personnel shortages in Ms. E's department. SOF ¶¶ 86–87.

- On one occasion, Ms. Johnston did not accept a suggestion that Ms. Harvey made about workflow. Several months later, when the same suggestion was raised by a White employee, it was accepted. SOF ¶ 88.

- Ms. Johnston sometimes sided with complaining pediatricians in disputes with Ms. Harvey. SOF ¶ 89.

- In 2022, Ms. Johnston became aware of concerns within Ms. Harvey's areas of responsibility, including that other nurses had complained about one particular NPS "all the time," that nurses expressed concern about communication, inclusion in decision-making, and other matters, and that seven nurses within Primary Care had left their full-time positions. SOF ¶¶ 28–30. Ms. Johnston expected Ms. Harvey to handle concerns about the NPS, and in November 2022, Ms. Johnston questioned Ms. Harvey's handling of a patient complaint and a coverage issue in Lexington, both in Ms. Harvey's areas of responsibility. SOF ¶¶ 28, 31–32. Ms. Harvey considered that Ms. Johnston or others should have been handling these issues. *Id.*

- In November 2022, Ms. Johnston criticized Ms. Harvey for failing to respond to a patient complaint—an issue that Ms. Harvey considered to be the responsibility of a Patient Services Representative under Ms. Harvey's supervision. SOF ¶ 31.

- When the patient complaint was raised in a meeting with Executive Director Brian Schuetz, Ms. Johnston, and others (the "November Senior Leadership Meeting"), one person's comments suggested Ms. Harvey had not followed the required workflow. After another person defended Ms. Harvey, the first apologized, but Mr. Schuetz did not let Ms. Harvey speak. SOF ¶ 93.

- Ms. Johnston and Ms. G met with Ms. Harvey on November 22, 2022, to discuss various matters relating to Ms. Harvey's performance. SOF ¶ 33. Ms. G then drafted an email which recapped that discussion and required Ms. Harvey to prepare a corrective action plan. Ms. G sent the draft email to Ms. Johnston for review on December 1. SOF ¶ 34. On December 4, Ms. Johnston replied to Ms. G with some changes, including adding a requirement that Ms. Harvey prepare a staffing proposal for her department. SOF ¶ 35. Ms. Johnston then finalized the email and sent it to Ms. Harvey on the morning of Tuesday, December 6 (the "Recap Email"). SOF ¶ 39.

### *C. Evidence of Racial Animus*

Ms. Harvey's claim that the hostility she allegedly faced was motivated by racial animus is primarily based on various verbal comments attributed to Ms. Johnston:

- At some time in 2020, in conversation with Ms. Harvey, Ms. Johnston described a particular Black doctor as "rough and tough," and may have called the doctor "argumentative" or "aggressive"; she also said the doctor did not "get along with anybody." Ms. Harvey, however, thought she got along with the doctor. SOF ¶¶ 96–97.

- Ms. Johnston, in talking with Ms. Harvey, on several occasions used expressions such as "rough around the feathers" or "rough around the edges" and "edgy" to describe

particular Black employees. SOF ¶¶ 98–100. Ms. Harvey testified that Ms. Johnston only used such terms to describe "women of color." SOF ¶96.

- On one particular occasion, Ms. Johnston used the terms "rough around the edges" and "uneducated" when discussing with Ms. Harvey an individual who sought a promotion six months after first being promoted to supervisor. (The individual did not have a college degree, and Ms. Johnston was unaware that individual had earned some college credits.) SOF ¶¶ 98–100.

- On another occasion, an employee, who was Black, applied for a lead role and Ms. Johnston declined to promote her, saying she was "rough and loud." Of the three employees who *were* selected for lead roles at that time, two were Black, and the third was Hispanic/Latino. SOF ¶¶ 101–102.

- Once, in 2021 or early 2022, while Ms. Johnston and Ms. Harvey were discussing their families and recent events, Ms. Johnston showed Ms. Harvey photos of her grandchildren. Ms. Harvey, in turn, showed Ms. Johnston a picture of her grandson. Ms. Johnston asked if Ms. Harvey's grandchild was White, which made Ms. Harvey uncomfortable. SOF ¶ 103.

- On August 9, 2022, after attending a meeting at which Ms. Harvey and another Black employee presented, Ms. Johnston spoke to Ms. Harvey about Ms. Harvey's remarks. Ms. Harvey's initial testimony at deposition was that Ms. Johnston called her "well-spoken" and that Ms. Johnston followed up with an email saying "the exact same thing." Docket No. 47-2 at p. 6 of 45. The email in question, however, uses different language. In the email, Ms. Johnston wrote that she "greatly enjoyed" the session and that Ms. Harvey "spoke very well and provided a great introduction and summary." SOF ¶¶ 104–106. In follow-up questions, after reviewing the email, Ms. Harvey seems to have agreed that the spoken words were that "that you 'spoke very well.'" Docket No. 45-2 at 381 of 424.[4]

- In fall 2022, Ms. Johnston told Ms. Harvey that nurses were leaving due to her "leadership" and said her "leadership style" was "autocratic"; Ms. Harvey disagreed. SOF ¶ 107.

- In November 2022, following a meeting between Ms. Johnston, Ms. G and Ms. Harvey at which they discussed Ms. Harvey's request to change the job grade for NPSs under her supervision, Ms. Johnston told Ms. Harvey that she had been "combative" and "aggressive." SOF ¶ 108. Ms. Harvey disagreed. She testified that she considered this criticism to be connected to her race because it was directed to her, and because of the "tone" and "manner" in which it was said. SOF ¶ 113.[5]

[4] The potential significance of this exact wording is discussed below.

[5] Plaintiff identifies this as a "disputed" Statement of Fact. The deposition transcript, however, is substantially as Defendant describes it.

## II. Legal Standards

### *A. Summary Judgment Procedures in General*

Rule 56 of the Federal Rules of Civil Procedure provides that, as to "each claim or defense—or the part of each claim or defense—on which summary judgment is sought," the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To preclude a grant of summary judgment, a factual dispute must be both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23–24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). To put it another way, "[a] factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. While the genuineness of a dispute is a matter of fact and inference (inference as to whether, given the facts, a reasonable factfinder could find in favor of the nonmoving party), the materiality of a dispute turns on the applicable law. To be material, a factual dispute must concern the required elements of a claim. Thus, a court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To prevail on its motion, a movant seeking summary judgment must first show "an absence of evidence to support the nonmoving party's case." *Pleasantdale Condos., LLC v. Wakefield*, 37 F.4th 728, 733 (1st Cir. 2022) (quoting *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir. 1989)).

The burden then shifts to the nonmovant, who must establish the existence of a genuine issue of material fact by producing "evidence that would support a jury verdict" in the nonmovant's favor. *Anderson*, 477 U.S. at 256. A nonmovant's production of evidence that is "merely colorable" or "not significantly probative" will be inadequate to defeat a motion for summary judgment. *Id.* at 249–50. A nonmovant cannot avoid summary judgment merely by asserting that a material fact is disputed. *See Cherkaoui*, 877 F.3d at 24 ("[T]he nonmovant must provide sufficiently supported evidence, without relying 'upon mere allegation or denials of [the movant's] pleading,' to establish a genuine issue for trial." (second alteration in original) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993))). "[C]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation" cannot alone defeat summary judgment. *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 81 (1st Cir. 2019) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). At the summary judgment stage, the nonmovant must point to competent evidence that would support the nonmovant's burden of proof. That is, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (quoting *Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

To determine whether there exists a genuine dispute of material fact, courts "'look to all of the record materials on file, including the pleadings, depositions, and affidavits' without evaluating 'the credibility of witnesses []or weigh[ing] the evidence.'" *Taite v. Bridgewater State*

*Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (alterations in original) (quoting *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014)). In so doing, "[t]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." *Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018).

### *B. Summary Judgment in Discrimination Cases*

By their nature, claims of discrimination involve issues of motive and intent. This means the Court must "proceed with caution and restraint when considering summary judgment motions." *Theidon v. Harvard Univ.*, 948 F.3d 477, 496 (1st Cir. 2020). Nevertheless, the core procedures outlined in *Anderson* and *Celotex* still apply, and a nonmovant must point to competent evidence that would satisfy the nonmovant's burden of proof. Thus, even in discrimination cases, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (quoting *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995)).

### *C. The Elements of a Hostile Work Environment Discrimination Claim*

The statute at issue here, Section 4 of Mass. Gen. Laws ch. 151B ("Chapter 151B"), provides in pertinent part:

> It shall be an unlawful practice: 1. For an employer, by himself or his agent, because of the race [or] color . . . . of any individual . . . to discriminate against such individual . . . in terms, conditions or privileges of employment . . . .

Chapter 151B.

The substantive legal standards applicable here are spelled out in the Court's order on MIT's motion to dismiss. Docket No. 17.

Under Chapter 151B, "[a] hostile work environment is one that is 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.'" *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001) (alteration in original) (quoting

*College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, 400 Mass. 156, 162 (1987)); *see Rosemond v. Stop & Shop Supermarket Co.*, 456 F. Supp. 2d 204, 212 (D. Mass. 2006) (stating that the basic framework for Title VII "applies to [C]hapter 151B hostile environment claims"); *Tousst v. Brigham & Women's Hosp.*, 166 F. Supp. 3d 110, 115 (D. Mass. 2015) (stating that "[u]nder both Title VII and Chapter 151B . . . [plaintiff] must show that [she] was subject to 'offensive, race-based conduct that is severe or pervasive enough' that it altered the conditions of [her] employment" (quoting *Landrau-Romero v. Banco Popular De P.R.*, 212 F.3d 607, 613 (1st Cir. 2000))).

In considering whether offensive conduct or harassment in the workplace is "race-based," the courts consider the explicit content of the harassment (for instance, use of racial epithets), and they also consider whether individuals in protected classes are subjected to disparate treatment. *See, e.g.*, *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 318 (1st Cir. 2016) (assessing—in the context of a hostile environment claim—whether plaintiff had offered evidence to support assertions that employer's actions, including disparate treatment, were motivated by discriminatory animus); *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 181 (1st Cir. 2008) ("Thompson's co-workers, who are of various races, acknowledge that Goodsell yelled at them at times, but they categorically deny that he ever made racially charged or racially insensitive statements."). To succeed on such a hostile workplace claim, a plaintiff must show that the environment was "sufficiently hostile or abusive in light of all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Thompson*, 522 F.3d at 180.

Although "[t]here is no 'mathematically precise test' to determine whether [Ms. Harvey] presented sufficient evidence that [s]he was subjected to a hostile work environment," the Court must look at "all the circumstances, including the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with [Ms. Harvey's] work performance." *Kosereis v. Rhode Island*, 331 F.3d 216 (1st Cir. 2003) (internal citation and quotation marks omitted); *see* 15 *LaGrange Street Corp. v. Mass. Comm'n Against Discrimination*, 99 Mass. App. Ct. 563, 572 (2021).

In the same vein, the First Circuit has noted, "we must consider several factors, none of which is individually determinative: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 73–74 (1st Cir. 2011) (quoting *Vega–Colon v. Wyeth Pharmaceuticals*, 625 F.3d 22, 32 (1st Cir. 2010)).

## III. Analysis

As noted above, MIT's motion for summary judgment focuses on two critical elements of a hostile work environment claim: whether the alleged harassment was sufficiently severe or pervasive to support a claim, and whether any of the alleged harassment was based on race.

To prevail at trial, Ms. Harvey would bear the burden of proving that that her "work environment was both objectively and subjectively offensive." *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 82 (1st Cir. 2001) (internal quotations omitted). On the subjective side, there is no dispute that Ms. Harvey *perceived* the environment as offensive. To forestall summary judgment, however, on the objective side she must also point to evidence that would permit a finder to fact to conclude that her workplace was one that "a reasonable person would find hostile or abusive." *Id.*

### *A. There Are No Material Disputes of Fact*

MIT's SOF and Ms. Harvey's response (Docket No. 48) reflect only a few putative factual disputes. *See* SOF ¶¶ 64, 78, 96, 113, 115, 116. Each of those disputes boil down to this: Ms. Harvey has repeatedly asserted, in the Complaint and in her deposition testimony, that she was subjected to discriminatory treatment based on race. She does not contest the particular factual averments in the Statement of Facts—these are, by and large, based on her own deposition testimony. She does, however, contest the inferences to be drawn from the evidence and she disputes MIT's efforts to circumscribe the evidence by focusing on Ms. Harvey's deposition testimony. *See id.*

To forestall summary judgment, the nonmovant must point to evidentiary materials and cannot simply rely upon the allegations of the complaint to demonstrate that there is any genuine issue of material fact. *See Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 174–75 (1st Cir. 1994). In this regard, Ms. Harvey fails to make any meaningful showing.

Faced with the specific evidence proffered by MIT in support of its summary judgment motion, Ms. Harvey has interposed an affidavit of Counsel which attaches a copy of Ms. Harvey's responses to interrogatories. Docket No. 47, 47-1. In key assertions that Ms. Harvey has identified as "disputed," Ms. Harvey cites a single interrogatory response as the basis for the claimed disputes. *See* Docket No. 48, Plaintiff's Response ¶¶ 113, 115–16. There is less here than meets the eye, however. The interrogatory response in question consists of a verbatim recitation of the allegations of the complaint, albeit with paragraph numbering removed. *Compare* Docket No. 1-1 (Complaint) *with* Docket No. 47-1 (interrogatories) *and with* Docket No. 48 ¶¶113 (Plaintiff's Response to Statement of Material Facts). Re-labelling the allegations of the Complaint does not change the substance. Even with the added wrapper of an affidavit of counsel, Ms. Harvey offers nothing beyond the conclusory allegations of the Complaint.

Ms. Harvey's interrogatory responses are dated March 17, 2025 (Docket No. 47-1), while her deposition was taken in July and September of 2025 (Docket No. 45-2). Thus, the deposition answers on which MIT relies post-date the interrogatory response in which Ms. Harvey re-copied the allegations of the Complaint. More importantly, the deposition testimony is significantly more specific than the interrogatory response. Thus, even if we attribute some significance to the fact that Ms. Harvey's interrogatory responses were submitted under oath (unlike the Complaint), the broad and conclusory language quoted in the interrogatories is directly refuted by the specific sworn answers that Ms. Harvey provided during her subsequent testimony.

Rule 56(e) explicitly requires the Court to consider suitable *evidentiary* materials. At the summary judgment stage, bare allegations of the Complaint will not suffice to create a genuine issue of material fact. *Cf. Celotex*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves* . . . ") (emphasis added). Indeed, even when a *later* affidavit is offered to contradict deposition testimony, the First Circuit has ruled that it may be disregarded at summary judgment unless there is a meaningful explanation for the discrepancy. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir. 1994) (citations omitted). In this case—with deposition testimony that post-dates and clarifies Ms. Harvey's interrogatory responses—it is Ms. Harvey's sworn deposition testimony, not her boilerplate reiteration of the allegations of the complaint, that must control.

A few examples in this case vividly illustrate why, at summary judgment, the Court considers *evidence*, and not just the original allegations of the Complaint. For instance:

The Complaint alleges:

> In a meeting . . . Ms. Harvey was accused of being "combative"—another trope used by MIT and Ms. Johnston to marginalize and demean Ms. Harvey as a black employee. White employees were allowed to speak up on their own behalf. If a black employee did the same thing, Ms. Johnston claimed they were "combative" which, of course, could subject them to discipline.

Docket No. 1-1 ¶ 30. In her deposition testimony, by contrast, Ms. Harvey testified that Ms. Johnston had used the term "combative" to describe Ms. Harvey's conduct in one particular meeting, but denied hearing it said about anyone else:

> Q. And are you saying she called anyone else "combative" other than you?
>
> A. In other words, I would say she would call . . . [Ms. D] "aggressive." Maybe she didn't use that word that day. "Argumentative," she would call [Ms. D].
>
> Q. You said she didn't call her "that word that day." What -- what were you referring to?
>
> A. She -- she may have used a different word.
>
> Q. Different from what?
>
> A. Maybe "aggressive" and "tough."
>
> Q. But -- I'm sorry -- you're saying not "combative"?
>
> A. No, no. She called me "combative."

Docket No. 45-2 at 338 and 324 of 424.[6]

Similarly, the Complaint alleges that "Ms. Johnston also made comments such as: black employees were 'rough and tough' compared to white employees." Docket 1-1 ¶ 22. At oral

[6] Consecutive pages of the Deposition, pages 149 and 150, are separately marked in Docket No. 45-2. The page numbers cited here refer to the blue page numbers in the header, 338 and 324 out of 424.

argument, however, Ms. Harvey's counsel conceded that there is no evidence that Ms. Johnston ever made comments or generalizations about Black employees as a group. Rather, counsel clarified, the claim was simply that Ms. Johnston had on some occasions, used such terms to describe particular individuals, who were Black. *See* Docket No. 51.

There is a considerable gulf between the suggestion in the Complaint that Ms. Johnston had disparaged Black employees—as a group—as "rough," and the evidence that Ms. Johnston used such terms, on some occasions, to describe particular individuals. These are not racial epithets, per se, and merely characterizing them as "tropes" does not satisfy Ms. Harvey's burden of proving illegal discrimination. Indeed, a more granular consideration of the evidence before the Court further attenuates the suggestion of race discrimination. Ms. Harvey did testify that she only heard Ms. Johnston use terms like "rough" "combative" or "uneducated" to describe Black individuals. *See* Docket No. 45-2 at 338 of 424 (". . . everyone that Maureen Johnston would relay -- saying that they were either 'rough and tough around the edges,' 'really rough,' 'non-educated,' or 'combative,' we were all women of color."). But this hardly establishes that such terms were a proxy for race discrimination and the circumstances suggest otherwise. The Court must assume, for purposes of summary judgment, that on one occasion Ms. Johnston told Ms. Harvey she had decided not to select an individual (who is Black) for the role of Lead Medical Assistant, "for the way she acts. She's rough and loud." SOF ¶ 101 (citing Harvey Deposition). It is uncontested, however, that two of the three employees who *were* selected for that role were Black. SOF ¶ 102.

The Complaint also alleged that "Ms. Johnston openly demeaned Ms. Harvey. Ms. Johnston did not do so with white employees." Complaint ¶ 20. Incorporating her interrogatory response, Ms. Harvey marks as "disputed" the assertion in the Statement of Material Facts that

"Ms. Johnston never publicly humiliated Ms. Harvey [citing Harvey Deposition at 249–250]." SOF ¶ 115. While Ms. Harvey's testimony is ambiguous as to what might constitute humiliation in general, she was unequivocal with respect to any *public* humiliation:

> Q. And did Ms. Johnston ever humiliate you?
>
> A. Yes.
>
> Q. And have you told me about any instance in which she humiliated you?
>
> A. The incidents that I may have presented it here (as stated).
>
> Q. I'm sorry?
>
> A. The incidents that may be on my deposition.
>
> Q. So, then, making sure I understand, are you saying that all of the incidents that you recounted to me were incidents where she humiliated you?
>
> A. She hasn't humiliated me publicly, no.

Docket No. 45-2 at 415–16 of 424.

Along the same lines, the Complaint describes an event that, on its face, might arguably describe an incident of race-based harassment:

> At one point, out of the blue, Ms. Johnston asked Ms. Harvey if her grandchild was "white" when she saw a photo of him. This was an inappropriate and offensive comment in the workplace and made Ms. Harvey feel marginalized, demeaned, and uncomfortable.

Complaint ¶ 23.

By contrast, Ms. Harvey's deposition testimony dissipates the assertion that she was subjected to any sort of "out of the blue" comment. In an uncontested Statement of Fact, the incident is described as follows:

> In a one-to-one meeting in 2021 or early 2022, Ms. Johnston and Ms. Harvey were discussing families and recent events. Ms. Johnston stated she had just come back from vacation and shared photos of her grandchildren. Ms. Harvey mentioned that she had seen her grandson and showed Ms. Johnston a picture of him. Ms. Johnston then asked if he was White, and Ms. Harvey replied that he was a person of color. Ex. 2 (Harvey Dep.), 146:11-17, 193:11-12, 193:22-194:3. Ms. Harvey felt

> "uncomfortable" with Ms. Johnston's question regarding her grandson's race. Id. 195:1-2.

SOF ¶ 103.

In short, there is no real dispute about what evidence the parties have identified. The question is whether, drawing all reasonable inferences in Ms. Harvey's favor, a reasonable finder of fact could find that Ms. Harvey has met her burden of proving that she was subjected to a hostile workplace in violation of Chapter 151B.

### *B. Objectively Severe and Pervasive Harassment*

#### *1. The Incidents in Question*

The Complaint in this case is replete with assertions that point toward a sort of disparate treatment theory of recovery. *See, e.g.,* Complaint ¶ 19 ("Ms. Johnston refused to listen to Ms. Harvey or to take valid suggestions from Ms. Harvey. Yet, Ms. Johnston was more than willing to do so with white employees."); ¶ 18 ("Ms. Harvey was . . . subject to micromanagement to which Ms. Johnston did not subject white employees."); ¶ 20 ("Ms. Johnston openly demeaned Ms. Harvey. Ms. Johnston did not do so with white employees."). However, with discovery complete, and faced with a motion for summary judgment, Ms. Harvey has failed to point to any evidence to substantiate a conventional disparate treatment analysis.[7] Instead, the Court is left to

[7] On its face, the language of Chapter 151B prohibiting discrimination "in terms, conditions or privileges of employment" is broad enough to include claims based on a showing that members of a protected class routinely and persistently received unfavorable treatment on matters that did not themselves constitute adverse employment actions. *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011) (considering whether claims that plaintiff was subjected to reprimands and mistreatment, which individually did not amount to adverse employment actions, "amount[ed] to a hostile work environment in the aggregate"). Thus, a hostile workplace claim could be based on showing a pattern or cumulation of disparate treatment in the workplace – even without proof of incidents of inherently abusive conduct (yelling, use of epithets, etc.). As a practical matter, however, making out such a claim may be daunting: it would entail delving into the merits of each particular workplace decision, offering evidence of animus, and then establishing that the

*Footnote continues on following page.*

consider the nature and circumstances of the particular incidents described in the Statement of Facts, to assess whether these suffice—individually or cumulatively—to support a hostile workplace claim. That is, whether Ms. Harvey's evidence shows a "work environment was both objectively and subjectively offensive." *Conto*, 265 F.3d at 82.

Ms. Harvey fails to point to evidence of the kind of abusive conduct that could support a hostile workplace claim. The incidents that Ms. Harvey complains about, which are detailed in the statement of facts and summarized above, involved ordinary workplace decision making: failures to adopt Ms. Harvey's recommendations about whom to promote; shifting Ms. Harvey's duties (and sending others to conferences linked to the re-assigned duties); questioning Ms. Harvey's leadership in the face of multiple employee departures; questioning Ms. Harvey's leadership in connection with reports of employee discontent within the group that Ms. Harvey supervised; and instructing Ms. Harvey to provide notice ahead of absences.

Assuming these incidents occurred as Ms. Harvey describes them, they do not amount to severe or pervasive harassment. On the contrary, these are ordinary supervisory actions. We must assume, for present purposes, that the decisions and actions at issue were misguided or ill-considered. But they do not add up to a workplace that a reasonable person would find hostile or abusive. There is nothing hostile or abusive in: deciding whether Ms. Harvey should spend her time on a particular committee; deciding whether to accept Ms. Harvey's recommendations regarding promotion or raises for subordinates; prioritizing hiring to backfill for departures in one or another department; deciding whether to authorize off-site job training for some of Ms.

---

accumulation of such events was sufficiently stark and pervasive to amount to an objectively hostile workplace. *See id.* ("And where a workplace objectively falls short of that 'abusive' high-water-mark, it cannot sustain a hostile-work-environment claim."). As explained in Section III.D, it is essential to consider the cumulative effect of the evidence.

Harvey's subordinates; deciding when and whether to authorize conference attendance; requiring Ms. Harvey to address complaints involving her areas of responsibility; and insisting on protocols regarding notification of absences. SOF ¶¶ 62–92. Ms. Harvey disagreed with these decisions and may well have been frustrated with management decisions that she thought were misguided. But mere disagreements about job decisions are not the stuff of a hostile workplace.

The picture does not change when we add in Ms. Harvey's claims about the particular adjectives that Ms. Johnston used in criticizing some aspects of Ms. Harvey's job performance. Ms. Harvey contends that she was unfairly criticized: for being "combative" or "aggressive" in pressing her recommendation that a particular subordinate's job grade should be revised (SOF ¶ 108); and, for having an "autocratic" leadership style (SOF ¶ 107). Nor does it add anything to point out that, at one meeting, a different supervisor criticized Ms. Harvey for failing to follow a workflow protocol (a contention that was promptly corrected by another attendee at the meeting, prompting an immediate apology), without permitting Ms. Harvey to address the issue. SOF ¶ 93.

Whether these criticisms were fair or not, they do not—considered alone or in conjunction with the various other employment decisions that Ms. Harvey complains of—amount to severe or pervasive discriminatory conduct.

We must assume at summary judgment that Ms. Johnston's management decisions were wrong. Ms. Harvey claims, for instance: that Ms. Johnston was wrong in assuming that complaints from employees in Ms. Harvey's group about "leadership" referred to Ms. Harvey; that Ms. Johnston moved too slowly and dragged her feet in addressing staffing shortages in Ms. Harvey's group; that Ms. Johnston should have adopted Ms. Harvey's recommendations for promotions, raises, and workflow; and that Ms. Johnston was sometimes incorrect in siding with

pediatricians. SOF ¶¶ 85–89. Given those assumptions, the actions taken by Ms. Johnston might be said to reflect poor managerial decisions—but no reasonable juror could conclude that they were objectively "abusive" or "harassing."

Nor does it change the analysis to label Ms. Johnston's supervision as "micromanagement," a conclusory term that adds nothing to the evidentiary mix. Indeed, it is difficult to conceive a workable standard by which the courts could be expected meaningfully to distinguish between appropriately close supervision and offensive micromanagement. Of the particular incidents at issue in this case, perhaps Ms. Johnston's request for advance notice when Ms. Harvey was taking leave might strike some observers as "micromanagement." However, not only Ms. Harvey, but other senior employees as well—White and Black—were held to the same standard. SOF ¶ 80. So, this adds no weight to Ms. Harvey's claim of hostile workplace discrimination.

There is no evidence in this case of conduct that "was physically threatening or humiliating," or that "unreasonably interfered with [Ms. Harvey's] work performance." *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003). At deposition Ms. Harvey testified unequivocally that there were no threats, physical or otherwise:

Q. Okay. Did Ms. Johnston ever physically threaten you?

A. Physically, no.

* * *

Q. And when I asked before about physically threatening, you said, "Physically, no." Were you intending to say that she threatened you in some other way –

A. No.

Q. -- other than physically?

Docket No. 45-2 at 415–16.

On the issue of "humiliation," the deposition testimony reflects some ambiguity about what that term encompasses. Ms. Harvey testified, in effect, that she was humiliated by the various incidents she had described in which her leadership was criticized, her suggestions were rejected, and the needs of her unit were overlooked. As discussed above, however, she denied that she was subjected to any public humiliation. *Id.*

As for interference with work performance, the deposition testimony is also unequivocal:

> Q. . . . Okay. And have -- did what you described as instances where you felt you were mistreated based on your race, have any impact on your work performance?
>
> A. No.

Docket No. 45-2 at 16.

*2. Comparison with Other Decisions*

Considered individually or as a group, the claimed instances of unfairness that Ms. Harvey catalogues are insufficient to make out a claim of harassment.

It is instructive to compare the facts in this case with other cases in which the First Circuit has affirmed summary judgment for employers accused of hostile workplace violations. In *Bhatti v. Trs. of Bos. Univ.*, for instance, the First Circuit addressed a hostile workplace claim that rested upon repeated criticisms and written reprimands which—for purposes of summary judgment—the Court deemed to be unmerited. 659 F.3d 64, 73–74 (1st Cir. 2011). Having found that none of these incidents amounted "to an adverse employment action," the Court considered "whether they amount to a hostile work environment in the aggregate." *Id.* As the Court concluded:

> The Center's conduct toward Bhatti was far from severe, never physically threatening, generally conducted in private so as not to be humiliating, and never overtly offensive; moreover, Bhatti has pointed to no effect whatsoever on her work performance. True, she sought psychological counseling, but this is evidence of subjective offense at best. Objectively, the Center's conduct here might have crossed the boundary from professional to unprofessional, but it never reached the

> level of abuse. And where a workplace objectively falls short of that "abusive" high-water-mark, it cannot sustain a hostile-work-environment claim.

*Id.* In this case, by contrast with *Bhatti*, there were no reprimands, written or otherwise, and it is difficult to identify any instance in which MIT's conduct "crossed boundary from professional to unprofessional." *See also Douglas v. J.C. Penney Co.*, 422 F. Supp. 2d 260, 280 (D. Mass. 2006), *aff'd*, 474 F.3d 10 (1st Cir. 2007) (noting that "poor performance reviews" and isolated incidents do not rise to a hostile work environment).

The First Circuit has noted—in the context of Title VII (federal discrimination) claims—that the court's role in considering the sufficiency of evidence before trial requires it "to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 44 (1st Cir. 2011) (quoting *Noviello v. City of Bos.,* 398 F.3d 76, 92 (1st Cir. 2005)). Applying that standard, the First Circuit in *Colon-Fontanez* affirmed a grant of summary judgment for the employer, on a factual record that included multiple instances of unseemly supervisory conduct that eclipsed the severity of the incidents at issue in this case. The plaintiff in *Colon-Fontanez* pointed to facts showing that: her supervisor "would refuse to meet with her"; "permitted other employees to come and go from her office," but "avoided Colón, required Colón to wait, restricted Colón's access to her, and refused to amicably greet her in general encounters"; on one occasion the supervisor "threw Colón and a co-worker out of her office, yelling at them in front of other . . . employees"; "Colón's general movements throughout the office were limited; if she left her desk to go to the bathroom, Colón's supervisor, or someone designated by her, would follow her; and "when other co-workers were invited to participate in a contracts workshop, Colón was not allowed to participate, even though Colón previously had engaged in such activities." 660 F.3d at

44. All this, the First Circuit affirmed, was insufficient to make out a hostile workplace claim. *Id.* at 44–45.

Similarly, the First Circuit's decision in *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34 (1st Cir. 2003), involved circumstances more egregious than anything Ms. Harvey encountered at MIT. In *Lee-Crespo*, the First Circuit affirmed a grant of summary judgment where the plaintiff alleged that her supervisor: falsely told her coworkers that the plaintiff had been drunk at a wedding; used a "loud" and "scolding" voice to "accuse[] her of having a negative attitude"; threatened a reassignment; and generally "displayed a disregard for professional courtesy" . . . marked by an "unprofessional managerial approach and accompanying efforts to assert her authority." *Id.* at 39–40, 46–47. Despite roundly criticizing the supervisor's behavior, the First Circuit affirmed a grant of summary judgment for the employer on the hostile workplace claim. *Id.*

By way of closer comparison, the events that Ms. Harvey describes are of much the same ilk as those which this Court found insufficient to make out a hostile work environment claim in *Tuvell v. Int'l Bus. Machines, Inc*, No. 13-cv-11292-DJC, 2015 WL 4092614, at *12 (D. Mass. July 7, 2015), *aff'd,* 643 F. App'x 1 (1st Cir. 2016). As in this case, *Tuvell* involved incidents that amounted to "regular business practices and policies" such as "switching employees on projects within the same group" and relatively standard workplace interactions and criticisms." 2015 WL 4092614, at *12. As in *Tuvell*, such incidents "do not approach the level of severe or pervasive conduct that would be objectively offensive." *Id.*

Ms. Harvey strains to analogize this case to ones that involved overtly discriminatory conduct not remotely like the circumstances present here. *See, e.g., McKeon v. Robert Reiser & Co.*, 770 F. Supp. 3d 351, 380–81 (D. Mass. 2025) (finding genuine issue of material fact as to

whether birthday card poster in which female employees' faces were pasted onto magazine pictures of women in bathing suits and t-shirt that referenced the outline of a female vagina were objectively offensive); *Romero v. McCormick & Schmick Rest. Corp.*, 448 F. Supp. 3d 1, 3–7 (D. Mass. 2020) (denying summary judgment where supervisor "hugged" employee over twenty times, grabbed employee's breasts on multiple occasions, and told her "you're going to be mine"); *Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 14–15 (1st Cir. 2002) (affirming trial verdict for plaintiff where evidence included "sexual comments, often accompanied by lascivious looks and offensive gestures," direct physical contact, scolding employee "for no reason, sometimes yelling at her in front of other employees," and "slapping her desk with his fist" and asking "'Aren't you tough? Are you scared?'"); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (summary judgment was inappropriate in face of "evidence that men in the Cheuvreux office 'objectified' women by openly viewing and sharing pornography, discussing their jaunts to strip clubs, rating the female employees' appearances, and making lascivious comments about women's outfits and bodies," an explicit comment that "male employees should be respected because they were 'male' and thus 'more powerful' than women," and a supervisor's "unwanted sexual attention, including two sexual propositions"); *Buckley v. Sec'y of Army*, 97 F.4th 784, 788–89 (11th Cir. 2024) (denying summary judgment in face of evidence that doctors at military clinic diverted white patients away from Black speech pathologist, including by telling a patient that the plaintiff had "'angry [B]lack woman syndrome' and that the patient 'had to be careful' with her"); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 211 (4th Cir. 2022) (complaint allegations were sufficient to state a claim where it was alleged that supervisor had asserted "that 'blacks cannot speak properly'", had mocked the plaintiff and "referred to her as 'you people,' and 'abruptly stood-up in a violent fashion causing

her chair to crash into the wall, screamed at [the plaintiff] and stormed out of the room'"); *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 609 (1st Cir. 2000) (overturning summary judgment where plaintiff was subjected to monitoring that included forcing him "to leave a note on his desk every time he went on break, to the bathroom, or to get a drink of water," and where supervisors "made jokes and comments about his race, including remarking upon his 'kinky hair'"); *Gnerre v. Massachusetts Comm'n Against Discrimination*, 402 Mass. 502, 507–08 (1988) (affirming MCAD's conclusion that repeated overtly sexual comments supported claim that landlord sexually harassed a tenant).

As noted above, we must assume at summary judgment that Ms. Johnston was wrong in every one of the management decisions that Ms. Harvey contests. On that assumption, the actions taken by Ms. Johnston might be said to reflect poor managerial decisions—but no reasonable juror could conclude that they were objectively "abusive" or "harassing." Indeed, the First Circuit in in *Lee-Crespo* found no triable issue in a case where there was, undisputably, an "unprofessional managerial approach." As the First Circuit has remarked, in an often-quoted comment, "[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).

The relevant caselaw, in short, lends no support to Ms. Harvey's contention that the evidence here could support a finding that she suffered severe or pervasive harassment in her workplace.

### *C. Racial Animus*

MIT argues that, even if Ms. Harvey had identified evidence to show she was subjected to a hostile work environment, the evidence would still be insufficient to warrant trial because

Ms. Harvey fails to point to evidence from which a reasonable finder of fact could conclude that such harassment was based on her race.

Ms. Harvey's response is two-fold. First, as discussed above, she attempts to bootstrap the allegations of the Complaint—which assert disparate treatment—via an attorney affidavit that references her interrogatory responses. But, otherwise, Ms. Harvey fails to point to any evidence to substantiate her initial allegations of disparate treatment so as to raise such an inference of racial animus.[8] *See Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 318 (1st Cir. 2016) (affirming employer's motion for summary judgment where "[plaintiff proffered] no evidence that any of the . . . actions were race related outside of his unsubstantiated assertions that the actions had to be the product of discriminatory animus"). For example, Ms. Harvey's claim that MIT denied a Black employee higher pay does not suggest racial animus, when the proffered comparator was a White employee in a different position, *i.e.*, not someone who was similarly situated. SOF ¶¶ 74–77.

Second, she argues that she was subjected to comments—about herself and about others—that amount to racist tropes. I review in turn the alleged instances of racially-charged remarks in Ms. Harvey's workplace:

Ms. Harvey points to an instance in 2020 when Ms. Johnston described a particular Black doctor as "rough and tough," may have called the doctor "argumentative" or "aggressive" and

[8] To be sure, evidence of disparate treatment of the Plaintiff or employees in general on account of a protected characteristic may be probative of a hostile environment. *Burns v. Johnson*, 829 F.3d 1, 17 (1st Cir. 2016) (instances of unequal treatment contribute to a sexually hostile work environment); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209–10 (4th Cir. 2019) ("While [the Fourth Circuit] has held that the primary focus in the hostile work environment analysis is on the plaintiff's experience, evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim."). In this case, however, Plaintiff has failed to point to evidence that would support any such showing of disparate treatment.

also said the doctor did not "get along with anybody" (a view that Ms. Harvey did not share). SOF ¶¶ 96–97. Ms. Harvey also testified that Ms. Johnston used the term "rough and loud" to distinguish one Black individual (who was not promoted to lead nurse) while promoting three other individuals, two of whom were Black and the other, Hispanic/Latino. SOF ¶¶ 101–102. Ms. Johnston also used the terms "un-educated" and/or "rough" to describe an individual who did not have a college degree (Ms. Johnston was unaware that the individual had received some college credits). SOF ¶¶ 98–100.

Although these comments were not directed toward Ms. Harvey herself, they are potentially relevant. For a hostile workplace claim—unlike a claim based on a particular adverse employment action—the Court properly considers evidence of comments directed toward others. *See Ruffino v. State Street Bank & Tr. Co.*, 908 F.Supp. 1019, 1038–1039 n. 34 (D. Mass. 1995) ("As a matter of settled law and common sense, a hostile environment claim requires consideration of the environment in which a plaintiff works."), *quoted in Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 541 (2001); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 260–61 (2d Cir. 2023) ("[O]ur precedents . . . make clear that a plaintiff need not be the victim of all discriminatory harassment relevant to her hostile environment claim.").

The central problem for Ms. Harvey is that none of her examples of invidious comments about other individuals who were Black reflect overtly racial content. The terms "rough and tough," "argumentative" and "aggressive" are, on their face, racially neutral. Furthermore, they are descriptive of qualities that may have been relevant in discussing workplace interactions. By the same token, in the context of medical clinic populated by nurses, doctors, and other highly-credentialed professionals, it is not necessarily invidious to refer to someone who lacks a college degree as "un-educated." Ms. Harvey testified that she only heard Ms. Johnston use terms like

"rough" or "rough and tough" to describe Black individuals. But there is nothing in the circumstances to suggest that such terms were proxies for racist epithets.

It is noteworthy that the 2020 comment about the "argumentative" doctor came the year before Ms. Johnston promoted both Ms. Harvey and another Black woman to the Associate Director level in the fall of 2021. The so-called "same actor inference" is apposite here. The fact that Ms. Johnston hired and promoted Ms. Harvey and gave her glowing reviews up until sometime in 2022—when the working relationship seems to have soured—undercuts any inference of racial animus. *See Matthews v. Raytheon Co.*, No. CIV.A. 08-3275, 2009 WL 5910243, at *4 (Mass. Super. Dec. 23, 2009) ("To the extent Matthews relies on Rhoads' purported animus, Raytheon is entitled to an inference that Rhoads' conduct was not discriminatory, because it was she who hired Matthews, knowing she was a black woman. Additionally, Rhoads supervises other black and female employees, none of whom have become embroiled in these kinds of personal feuds with her.") (citing *LeBlanc*, 6 F.3d at 847). *See generally Rodriguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 46 & 51 n.8 (1st Cir. 2019) (1st Cir.1993) (affirming grant of summary judgment based, in part, on "same actor inference").

Nor is there any inference of racial animus in the fact that, in the fall of 2022, Ms. Johnston told Ms. Harvey that nurses were leaving due to her "leadership" and said her "leadership style" was "autocratic." SOF ¶ 107. Whether such criticisms were fair or not, they relate to race-neutral workplace behaviors that are entirely appropriate for discussion between a supervisor and a subordinate manager. With Ms. Harvey's promotion to a position of leadership, feedback about her performance would inevitably be framed in those terms. Similarly, criticism of Ms. Harvey's conduct during a particular meeting in November 2022 as "combative" and

"aggressive" (SOF ¶ 108) reflects no overtly racial content and is, again, within the scope of matters that may reasonably discussed in the workplace.

Ms. Harvey marks as "contested" the assertion in the Statement of Facts that:

> Ms. Harvey considered that the description of her as having been "aggressive" and "combative" during the Job Grade Meeting was connected to her race because it was directed to her and because of the "tone" and "manner" in which it was said.

SOF ¶ 113 (citing Docket No. 45-2 at 411–12 of 424). As discussed above, Ms. Harvey offers nothing to rebut this statement of fact, apart from her attempt to reassert the conclusory allegations of the Complaint. I have reviewed the cited deposition excerpts, and the proffered Statement of Fact is a fair characterization of Ms. Harvey's testimony: Ms. Harvey expressly pointed to tone and context as the basis for her assertion that Ms. Johnston's use of terms like "aggressive" and "combative" had racial overtones in the particular situations at issue.

As a general rule, under Federal Rule of Evidence 701, testimony from a participant in a conversation is admissible in interpreting ambiguous comments or specialized terminology. *See, e.g., United States v. Santiago*, 62 F.4th 639, 649 (1st Cir. 2023). Thus, it cannot be said that Ms. Harvey's observations about the tone and manner of the remarks she found objectionable is wholly inadmissible or irrelevant. But this is not a case about specialized or ambiguous lingo, and the key contested issue is not the *meaning* of particular words. Rather, the dispute is over whether the use of such words is objectively indicative of racial animus. Ms. Harvey's testimony would be admissible primarily to show Ms. Harvey's own (subjective) perception, which is a necessary—but not sufficient—component of Ms. Harvey burden of proof at trial. But, as noted above, Ms. Harvey bears the burden of showing that her "work environment was both objectively and subjectively offensive." *Conto v. Concord Hosp., Inc.,* 265 F.3d 79, 82 (1st Cir. 2001) (internal quotations omitted). Where there is no material dispute about what words were

said, the mere fact that Ms. Harvey perceived those words as racially-charged does not cure the dearth of evidence to show an objectively offensive workplace.

Turning to the next instance that Ms. Harvey cites, it is difficult to discern any invidious content in the incident in 2021 or early 2022, when Ms. Johnston and Ms. Harvey were discussing their families and their recent vacations and Ms. Harvey showed Ms. Johnston a picture of her grandson and Ms. Johnston asked if he was White. SOF ¶ 103. It cannot be doubted that issues of race and skin color are fraught topics, particularly because of the many ways that they are intertwined in our society with a longstanding and persistent history of discrimination and bigotry. It is not the case, however, that every mention of skin color amounts to a hostile racial epithet. It may be conventional to avoid the questions of skin color in casual conversation, for fear of giving offense. And the exchange described may well have been awkward. But there is nothing in the reported exchange from which a reasonable finder of fact could conclude that it evidenced, or contributed to, a racially hostile workplace.

Lastly, Ms. Harvey points to the August 9, 2022, incident when, after attending a meeting at which Ms. Harvey and another Black employee presented, Ms. Johnston spoke to Ms. Harvey about Ms. Harvey's remarks. Ms. Harvey's initial testimony was that Ms. Johnston had called her "well-spoken" and that Ms. Johnston had followed up with an email saying "the exact same thing." Docket No. 47-2 at 6 of 45. The email in question, however, uses different language. In the email, Ms. Johnston wrote that she "greatly enjoyed" the session and that Ms. Harvey "spoke very well and provided a great introduction and summary." After being shown the email, Ms. Harvey agreed that these were the terms used. SOF ¶¶ 104–106.

The distinction in the wording used is potentially significant. By dictionary definition, adjectives like "well-spoken" or "articulate," may appear as compliments, but they commonly

carry an invidious implication that such qualities are unusual or exceptional for a Black person. *Cf.* *Bloomberg apologizes after critics say his calling Booker 'well spoken' was racist*, The Hill, available at https://thehill.com/homenews/campaign/473485-bloomberg-apologizes-after-he-calls-booker-well-spoken-i-probably-shouldnt/ (quoting Sen. Corey Booker, "It's sort of stunning at times that we are still revisiting these sort of tired tropes . . .."); *Political Experts Weigh In on Biden Gaffe*, NPR, available at https://www.npr.org/transcripts/7127782 (February 2007 panel discussion of then-candidate Joseph Biden's reference to then-candidate Barack Obama as a "mainstream African-American who's articulate, bright and clean, and a nice looking guy").

In this case, any invidious implications about Black people as a class are mitigated, not only by the difference in wording but also by the context. This was unquestionably a compliment about Ms. Harvey's contribution to a particular meeting. In pertinent part, the email reads:

> Hi Regina
>
> I greatly enjoyed this morning's leadership development session.
>
> You spoke very well and provided a great introduction and summary.
>
> It was lovely to see clinical and non-clinical leaders in the same room. All were attentive and engaged.

Docket No. 45-9, 2 of 5. Whatever invidious racial overtones Ms. Harvey may have discerned in the exchange, no reasonable finder of fact could conclude that it contributed to any severe or pervasive racially abusive working environment.

As the First Circuit has noted, in connection with a Massachusetts hostile work environment claim, "ambiguous remarks, tending to suggest animus . . . are insufficient, standing alone, to prove an employer's discriminatory intent." *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 180 (1st Cir. 2008) (quoting *Speen v. Crown Clothing Corp.,* 102 F.3d 625, 636 (1st Cir. 1996)).

The remarks that Ms. Harvey points to as signaling racial animus fall far short of the kind of overt, but isolated, comments that the First Circuit in *Thompson* found insufficient to survive summary judgment. The comments at issue in *Thompson* included an instance in which the plaintiff's supervisor told the plaintiff, at a company Christmas party, "I hate Jamaican music and Jamaicans" and, on another occasion, "I'll deal with you, you fucking Jamaican." 522 F.3d at 173*; see also Gillenwater v. Home Depot, Inc.*, 2022 WL 17363508, at *10 (D. Mass. Dec. 1, 2022) (finding insufficient evidence to warrant trial on hostile workplace claim where plaintiff pointed to "insults, slurs, name calling (P'Diddy) . . . intimidation, ridicule, mockery . .. . Brenda [a manager] walking me saying "What's up" Like it is a joke ... mocking me.").

As the First Circuit has noted, "To establish a hostile work environment, [a plaintiff] is required to "show that h[er] work environment was so pervaded by racial harassment as to alter the terms and conditions of h[er] employment." *Garmon*, 844 F.3d at 317 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 768 (1998) (dissenting opinion)). Pointing to racial harassment cases that set the standard for defining "the severity of the offensive conditions necessary" to make out a claim, the Supreme Court highlighted cases showing that "[d]iscourtesy or rudeness should not be confused with racial harassment" and that "a lack of racial sensitivity does not, alone, amount to actionable harassment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36–37 (3d ed. 1996)).

At the summary judgment stage Ms. Harvey is entitled to the benefit of all reasonable inferences that a finder of fact could draw from the evidence. Even with that benefit, however, Ms. Harvey's evidence is insufficient to demonstrate any egregious "lack of racial sensitivity,"

let alone the sort of pervasive racial harassment that could been deemed to alter the terms and conditions of her employment.

### *D. Cumulative Effect of the Evidence*

Although it is a useful heuristic, there is a degree of arbitrariness in categorizing the incidents at issue here as evidence either of "harassment" (on the one hand) or of "racial animus" (on the other hand). In some cases, the use of racial epithets will itself be a key component of the harassment at issue. In other cases, isolated racial comments, coupled with a protracted pattern of egregiously unequal treatment in the workplace may be the focus.

Apart from considering particular events in isolation, it is essential to consider the cumulative effect of the evidence. *See generally Lee-Crespo*, 354 F.3d at 46 n.9 (noting that while it may be useful to categorize incidents, the court must also consider the cumulative effect of the events in question). To that end, I have endeavored to consider whether, when considered all together, the evidence in this case would suffice to permit a reasonable factfinder to conclude that Ms. Harvey was subjected to a work environment "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [that] poses a formidable barrier to the full participation of an individual in the workplace." *Cuddyer*, 434 Mass. at 532 (internal quotation marks and edits removed).

By way of comparison to other decided cases—as cited above—this is not a close case: The evidence here is insufficient to make out a hostile workplace claim, in light of "all the circumstances, including the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with [Ms. Harvey's] work performance." *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003)

## CONCLUSION

For the forgoing reasons, I RECOMMEND that MIT's motion for summary judgment (Docket No. 42) be ALLOWED.

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: February 6, 2026

NOTICE OF RIGHT TO OBJECT

In accordance with Rule 3 of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, the parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b) or Federal Rule of Criminal Procedure 59(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Sec'y of Health & Hum. Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).